**NATIONAL LIFE INSURANCE COMPANY, Plaintiff,**

v.

**PHILLIPS PUBLISHING, INC., and Richard E. Band and The Wall Street Digest, Inc., Defendants.**

Civ. N–90–1374.

United States District Court, D. Maryland.

June 9, 1992.

628

Theodore Sherbow, Michael P. Smith, and Weinberg and Green, Baltimore, Md., for plaintiff Nat. Life Ins. Co.

Lee T. Ellis, Jr., Anne R. Noble, Bruce W. Sanford, and Baker & Hostetler, Washington, D.C., for defendants Phillips Pub., Inc. and Richard E. Band.

Mary R. Craig, and Doyle & Craig, Baltimore, Md., Mary E. O'Laughlin, Jerrold V. Moss, and Rubin, Quinn, Moss, Heaney & Patterson, Philadelphia, Pa., for defendant The Wall Street Digest, Inc.

## MEMORANDUM OPINION

NORTHROP, Senior District Judge.

Now pending before this Court is Defendants' Renewed Motion for Summary Judgment on 1) whether Plaintiff is a Public Figure; 2) the degree of fault Plaintiff must apply to Defendants' conduct; and 3) whether Defendants' conduct constitutes malice (Paper Nos. 92 and 100). The Motion is opposed (Paper No. 98). The Motion was made and a hearing conducted pursuant to this Court's Orders (Paper Nos. 72, 84, and 96). After considering the arguments made by counsel at the hearing, in the pleadings, attachments and exhibits, this Court grants Defendants' Motion for Summary Judgment.

## I. *Background*

### A. Facts

Plaintiff, National Life Insurance Company ("National Life"), sues Defendants, Richard E. Band ("Band"), Phillips Publishing, Inc. ("Phillips"), and *The Wall Street Digest* ("Digest"), for statements written by Band, published by Phillips and reprinted by the Digest.

The Plaintiff is among the twenty-five largest mutual life insurance companies in the country, with 250,000 policy holders, over $4 billion in assets and over $25 billion in insurance policy coverage. Plaintiff is headquartered in Vermont but advertises nationally and has nationwide representation of insurance agents that nationally market its insurance products.

Defendant Band is a financial news analyst and editor. The alleged defamatory statements were initially printed in a newsletter he started in 1989 called *Profitable Investing*. At the time of the alleged defamation, *Profitable Investing* had a subscribership of approximately 20,000. Defendant Phillips, is a publisher of Band's newsletter, the special reports that accompany the newsletter and the marketing materials that promote *Profitable Investing*. Phillips publishes periodicals in the investment, health, telecommunications, banking and defense industries. Defendant, Digest, is a republisher of an article authored by Band that initially appeared in the March 1990 edition of *Profitable Investing*. Digest, which has a subscribership of approximately 22,000, did not publish, republish or circulate any other material that is the subject of this suit.

In the fall of 1989, Band prepared to launch *Profitable Investing*, and decided to offer to new subscribers, among other topics, his assessment of the insurance industry. Phillips sent new subscribers not only the newsletter, but bonus reports on selected topics. Bonus reports were intended to bring new subscribers up to date with Band's investment "tips." In addition to the newsletter and bonus reports, *Profitable Investing* was marketed by direct mail through various promotional packages. The promotional package included information about Band, statements from various articles printed in the newsletter, and a subscription application. Phillips mailed the marketing or promotional materials for the newsletter *Profitable Investing* to a select audience of persons who had previously demonstrated an interest in purchasing a financial or investment publication. The materials were not sent to the general public, but to readers and investors who had been subscribers to similar publications and whose names were obtained through purchased mailing lists.

Plaintiff's allegations of defamation may be placed into two categories. The first category, the publications, includes the newsletter, the reprinted Digest article and bonus reports.[1] The second category contains the promotional packages for the Publications which Plaintiff characterizes as commercial speech.[2]

---

1. These Publications are entitled *Profitable Investing,* together with the reports "How Safe Is Your Insurance," "Thirty–Seven Blue Chip Investments To Unload Now" and the "Treasure Chest of Fortune Making Tips."

2. The promotional packages upon which Plaintiff bases its claim of defamation are: the "Launch Package," the "April Bulletin," the "Named In This Letter Bulletin," the "May Bulletin," and the (revised) "May Bulletin."

The alleged defamatory statements contained in articles authored by Band assess the insurance industry as a whole, and Plaintiff contends, National Life in particular. Although the statements differ somewhat in content, they all share a common approach in the way that Plaintiff, along with other insurance companies, was mentioned in the Publications and marketing materials. In the first of the publications, "How Safe is Your Insurance?" Band focuses on the insurance industry generally noting, that unlike bank accounts, the federal government does not guarantee insurance policies. Band then states that readers should avoid relying on the A.M. Best ("Best") insurance company rating service when evaluating an insurance company. According to Band, the Best rating service was too closely tied to the insurance industry and gave nearly all of the largest insurance companies, including the Plaintiff National Life, their highest rating when evaluating the companies' claims paying ability. Band went on to say that because of a dissatisfaction with Best, other rating services such as Standard & Poor's, were beginning to rate the claims paying ability of insurance companies. These services provided a more thorough review of the financial stability and, therefore, the claims paying ability of the insurance companies. Band then asserted that unless a company received one of Standard & Poor's highest rating grades (a grade no lower than AA), Band would not recommend it, because in his view the company was susceptible to adverse economic changes. Finally, Band listed the ten companies, out of a total of the seventy-six insurance companies, that Standard & Poor's rated, who fell below the AA grade. National Life, with an A + grade, was one of those companies. Band made additional statements concerning how insurance companies were investing in risky junk bonds and real estate. These investments coupled with an uncertain

economy made those companies that Standard & Poor's rated below a AA, too dangerous to invest in or guarantee an insurance policy.

These statements by Band on the insurance industry and other investment topics were then carried in the Publications sent to current subscribers. The statements were also reprinted in the marketing materials and sent to those that Phillips and Band were attempting to obtain as new subscribers.[3]

Defendants characterize the Publications and marketing materials as merely an attempt to inform readers of ways of developing a conservative investment philosophy that would safely increase their net worth by minimizing risk and yet yielding significant gains. All of the topics on which Band wrote, including the insurance industry, were according to Defendants, designed to inform readers and help them make intelligent investment decisions.

Plaintiff has a different view. According to National Life, Defendants' statements were part of a get rich scheme whereby Band concocted sensational stories that preyed on investor and consumer fear. Plaintiff claims that Band knew generally of some risky insurance company investments and used that limited information to his benefit. Band, according to Plaintiff, simply drew an arbitrary line in the Standard & Poor's rating system and without any further thought, claimed that companies below the line were in financial disarray because of risky investments in an uncertain economy.

Plaintiff learned of Defendants' statements in March of 1990 in the article Digest reprinted shortly after it appeared in Band's newsletter. Plaintiff contacted Defendants Band and Phillips on or around early May of 1990 and asked for a retrac-

**3.** It bears noting that Band's articles on the insurance industry were presented against a backdrop of many articles that appeared in publications across the country on the financial stability of the life insurance industry as measured by the financial health of life insurance companies. There was a growing public concern about the insurance industry due to investments by some insurance companies in risky ventures and the growing number of insurance company failures. The insurance industry situation was frequently compared to the financial problems that plagued the savings and loan industry.

tion and shortly thereafter filed this law suit.

### B. Prima Facie Case for Defamation

Defendants argue that plaintiff's allegations of defamation are not actionable because plaintiff has failed to make out a *prima facie* case.

■ To make out a *prima facie* case of libel under Maryland law, plaintiff must show:

1) that defendants published statements *of or concerning* plaintiff to a third party;

2) that the statements were *false and defamatory;*

3) that the statements were published with the *degree of fault* required by the constitution;

4) that the statements resulted in harm to plaintiff. *See DeLeon v. St. Joseph Hospital, Inc.*, 871 F.2d 1229, 1236 (4th Cir.1989); *Mareck v. Johns Hopkins University*, 60 Md.App. 217, 223, 482 A.2d 17 (1983), *cert. denied*, 302 Md. 288, 487 A.2d 292 (1985).

Where a plaintiff in a defamation suit is a "public figure", plaintiff must show actual malice on the part of the publisher in order to prevail upon his claims. *New York Times v. Sullivan*, 376 U.S. 254, 288–91, 84 S.Ct. 710, 730–32, 11 L.Ed.2d 686 (1964); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

■ Since determining Plaintiff's status is central to National Life's ability to establish its *prima facie* case, the Court ordered the parties to prepare briefs on National Life's public figure status, the degree of fault required of defendants in order for Plaintiff to sustain its libel case, and finally whether Defendants' conduct constitutes malice. The Court's examination of the public figure status is appropriate at this juncture, because it is a question of law. *Rosenblatt v. Baer*, 383 U.S. 75, 88, 86 S.Ct. 669, 677, 15 L.Ed.2d 597 (1966) ("We remark only that, as in the case with questions of privilege generally it is for the trial judge in the first instance to determine whether [plaintiff] is ... a 'public fig-

ure'"); *Reuber v. Ford Chemical News, Inc.*, 925 F.2d 703, 708 (4th Cir.1991) ("This determination [of plaintiff's public figure status] is ultimately one of law."); *Fitzgerald v. Penthouse Intern., LTD.*, 691 F.2d 666, 669 (4th Cir.1982) ("Once the pertinent facts are found or, as here, there is no substantial question of material fact in contention, the issue of whether plaintiff is a public figure is a question of law for the Court."); *see also Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1293 n. 12 (D.C.Cir.1980).

Plaintiff argues first that for purposes of this controversy, it is not a public figure. Second, Plaintiff argues that if it is a public figure, the malice standard should not apply to all of Defendant's statements. Plaintiff claims that the statements written by Band and Published by Phillips that were contained in the promotional materials are more appropriately characterized as commercial speech, and therefore, should not receive the higher First Amendment protections of the malice standard. Finally, Plaintiff argues that even if the malice standard does apply to Defendants' conduct, Defendants can be shown to have acted with malice.

Defendants disagree. Defendants claim that Plaintiff is a public figure. Further, Defendants claim that the statements in the promotional materials cannot be characterized as commercial speech and even if they could, the malice standard still applies to Defendants' conduct. Finally, Defendants' claim that their motion for summary judgment should be granted because Plaintiff cannot under any circumstances show by clear and convincing evidence that Defendants acted with malice. As such, according to Defendants, Plaintiff is unable to sustain the *prima facie* case for defamation.

The Court's analysis will proceed in five steps. First, the Court will examine whether National Life is a general purpose public figure that occupies a position of general notoriety in the community. Second, National Life's status as a limited purpose public figure will be reviewed, to see if

Plaintiff has inserted itself into the vortex of a public controversy that relates to the alleged defamatory statements. Third, as part of this public figure inquiry, National Life's status a corporation will be considered. Fourth, the Court will assess National Life's argument that Defendants' promotional materials are merely commercial speech, and as such, should be judged against a negligence standard. Finally, the Court will examine whether, as a matter of law, Plaintiff can sustain its case when the traditional malice standard is used to evaluate Defendants' conduct.

## II. *Legal Analysis*

### A. Summary Judgment

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56. Regarding materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Regarding genuineness, a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

The party seeking summary judgment bears the initial burden to show that there is an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). This burden does not require the moving party to produce *evidence* showing the absence of a genuine issue of material fact, but only to point out the absence of a material fact. *Id.* (emphasis added).

In responding to the defendant, the adverse (non-moving) party, in this case the plaintiff, "may not rest upon the mere allegations or denials of the adverse party's pleadings, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

The Supreme Court has stated that "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552. The mere existence of a scintilla of evidence in support of the non-moving party's case will be insufficient; there must be evidence on which the jury could reasonably find for the non-moving party. *Id.*, 477 U.S. at 252, 106 S.Ct. at 2512. The evidence of the non-moving party is to be believed and all justifiable inferences are to be drawn in the non-moving party's favor. *Id.* (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970)).

Under Rule 56, where possibly subjective evaluations are at issue, as here where a determination of whether Defendants acted with actual malice is at issue, the Fourth Circuit has cautioned against a Court taking those determinations away from a jury. *Cf. Herold v. Hajoca Corp.*, 864 F.2d 317, 319 (4th Cir.1988) (Fourth Circuit cautioned against motion for judgment as a matter of law where motive and causation are at issue in age discrimination case). However, in this context, if Plaintiff must show that Defendants acted with malice, Plaintiff must be able to make such a showing by clear and convincing evidence. *New York Times*, 376 U.S. at 254, 84 S.Ct. at 710. The Supreme Court has required that a Plaintiff must meet the clear and convincing evidence standard if *New York Times* applies, in order to survive a motion for summary judgment. *Anderson*, 477 U.S. at 256–57, 106 S.Ct. at 2514–15. Therefore, determining Plaintiff's status as a public figure, as it is a question of law, as well as considering Defendants' arguments that Plaintiff cannot demonstrate that Defen-

dants acted with malice, are appropriate for Court review.

### B. General Purpose Public Figure

■ The first step in the analysis of Plaintiff's status is to examine whether National Life is a general purpose public figure. A general purpose public figure is one who occupies a position of "general fame or notoriety in the community through pervasive involvement in the affairs of society." *Gertz v. Robert Welch, Inc.*, 418 U.S. at 351–52, 94 S.Ct. at 3013; *see also, Blue Ridge Bank v. Veribanc, Inc.*, 866 F.2d 681, 687 (4th Cir.1989). Determining Plaintiff's status is critical because damages for defamation where plaintiff is a public figure or public official can only be recovered upon a showing that Defendants acted with malice. While a private figure may recover for damages under a lower standard of defendant culpability. *Reuber v. Food Chemical News, Inc.*, 925 F.2d 703, 708 (4th Cir.1991).

Erroneous statements of fact do not warrant constitutional protection. However, requiring proof of Defendants' malice where Plaintiff is a public figure stems from a recognition that error is "inevitable in free debate." *Gertz*, 418 U.S. at 340, 94 S.Ct. at 3007. As the Supreme Court stated, the *New York Times* standard embodies this nation's commitment to the principle that debate on public issues should be "uninhibited, robust and wide open and that it may well include vehement, caustic and sometimes unpleasantly sharp attacks ..." *New York Times v. Sullivan*, 376 U.S. at 270, 84 S.Ct. at 721. Therefore, to give freedom of expression the "breathing space" it requires, some error is tolerated. *Id.* at 298, 84 S.Ct. at 736.

■ However, First Amendment concerns must be balanced against the legitimate state interest in compensating individuals for the harm inflicted on them by defamatory statements of fact. Protecting one's good name and reputation "reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty." *Rosenblatt*, 383 U.S. at 92, 86 S.Ct. at 679 (Stewart, J. concurring). As such, the evidence standard for determining a general purpose public figure is a strict one, requiring clear and convincing evidence of the general fame and pervasive influence in societal affairs. *Veribanc*, 866 F.2d at 687.

■ Defendants claim that National Life is a general purpose public figure. Defendants support their claim with a number of exhibits regarding National Life's influences in the public arena, corporate size and numerous articles, primarily from Vermont newspapers, that catalogue virtually every aspect of company behavior and executive pronouncements.[4]

Plaintiff contends that properly applying *Gertz* to this case requires clear evidence that National Life has achieved national recognition. Plaintiff contends that the test for general public figure status involves an examination of the notoriety in the area where the defamation took place in order to meet the requirement that National Life achieved general fame in the community. According to Plaintiff, Defendants have only demonstrated at most, National Life's prominence in Vermont, a state in which only one fifth of one percent of the recipients of the publications and promotional materials reside.

Reserving judgment, at this point, on Plaintiffs' definition of community, the Court finds that Defendants have failed to meet their burden of demonstrating that National Life is a public figure on all issues. *See Veribanc* 866 F.2d at 687 (although the Fourth Circuit found that the local bank exercised considerable influence over the economy of the county, the Circuit Court did not find that the plaintiff exercised pervasive influence over all public

---

**4.** *See e.g.*, Exhibits A, B, G, I and M attached to Defendants' Reply Memorandum and Volume II Exhibits 21, 22, and 23 attached to Defendants Supplemental Memorandum of Defendant, *The Wall Street Digest, Inc.* on Public Figure status of Plaintiff (Exhibit 23 for example, is a collection of articles detailing National Life's opposition to a Vermont state initiative that would have prevented certain AIDS testing by insurance companies).

issues so as to elevate it to general purpose public figure status).

Here, as in *Veribanc*, National Life exercises considerable influence over the economy of Vermont. Further, National Life may be prominent on a variety insurance of issues in a national community of investors. *See Reuber*, 925 F.2d at 709 (Fourth Circuit confines definition of community to individuals familiar with the particular public controversy for purposes of limited public figure status analysis).

However, National Life's fame and pervasive influence appear confined both to the borders of Vermont on a variety of issues and to the borders of insurance related issues on a national level. As such, the Court finds that National Life is not a general purpose public figure that risked the spotlight of public comment on all aspects of its corporate life. *See e.g., Carson v. Allied News Company*, 529 F.2d 206 (7th Cir.1976); *Buckley v. Littell*, 539 F.2d 882 (2nd Cir.1976), *cert. denied*, 429 U.S. 1062, 97 S.Ct. 785, 786, 50 L.Ed.2d 777 (1977). *But see Martin–Marietta Corp. v. Evening Star Newspaper Co.*, 417 F.Supp. 947 (D.D.C.1976) (publicly held corporation characterized as public figure even though the corporation may not be "household word" like General Motors).

### C. Limited Purpose Public Figure

■ An examination of *Gertz* reveals that there is more than one route to becoming a public figure. "Even though a person is not a public official or general public figure, an individual may have cast himself into the forefront of a public issue so as to become a limited purpose public figure." *Fitzgerald*, 691 F.2d at 668 (citing *Gertz*, 418 U.S. at 345, 94 S.Ct. at 3009). The Court's justification for this additional public figure category is predicated on two grounds. The Supreme Court recognizes that public figures are less vulnerable to injury from defamatory statements because of their ability to resort to effective "self-help." Second, and more importantly according to the Supreme Court, is the normative consideration, that public figures are less deserving of protection than private individuals because public figures, like public officials, have "voluntarily exposed themselves to increased risk of injury from the defamatory falsehood concerning them." *Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157, 164, 99 S.Ct. 2701, 2706, 61 L.Ed.2d 450 (1979) (citing *Gertz*, 418 U.S. at 345, 94 S.Ct. at 3009).

The bifurcated approach between public-private figures adopted by the Court was bifurcated once more between "speech on matters of public concern," and speech that is of a purely private nature. *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758–59, 105 S.Ct. 2939, 2944–45, 86 L.Ed.2d 593 (1985); *Veribanc*, 866 F.2d at 686 (the imposition of liability involves a determination of whether or not the speech involves a matter of public concern). Legal precedent requires a dual inquiry regarding the subject matter of the publication and the status of the defamed entity. *Veribanc*, 866 F.2d at 686.

In the instant case, both National Life and the Defendants agree that the public controversy implicated the financial health of the insurance industry. Defendants, however, make a further refinement of the controversy. Defendants claim that the health of the industry was diagnosed in the public forum in light of the strength of individual insurance companies.

Either characterization places this controversy squarely within the bounds of Fourth Circuit precedent as a public controversy. *Veribanc* 866 F.2d at 686 ("Because of the obvious importance of banks to the financial health of our communities, an historic governmental interest in the operations and solvency of these institutions, we have no difficulty concluding that [defendants'] statements relate to a matter of public controversy.") In the instant case, as in *Veribanc*, the controversy was over the financial health of institutions that are regulated by the government and are of obvious importance to the community. Therefore, this Court finds that the controversy surrounding National Life was a matter of public concern.

In determining whether Plaintiff is a limited purpose public figure, the Fourth Circuit has erected a five-part test:

"1) The Plaintiff has access to channels of effective communications; 2) the Plaintiff voluntarily assumed a role of special prominence in a public controversy; 3) the Plaintiff sought to influence the resolution or outcome of the controversy; 4) the controversy existed prior to the publication of the defamatory statements; and 5) the Plaintiff retained public figure status at the time of the alleged defamation."

*Fitzgerald,* 691 F.2d at 668. Each of these factors will be considered in turn.

■ National Life, Defendants contend, has ample access to effective channels of communications. Plaintiff, on the other hand, denies this access exists. National Life claims that Defendants eliminated Plaintiff's access by refusing to turn over mailing and subscriber lists or print a retraction in their publications.

This Court finds that by any traditional measure of access, National Life has effective means of communication. National Life's corporate executives command leadership positions in national trade organizations that represent insurance industry interests.[5] National Life's views on issues have been extensively reported in the media. This coverage includes articles authored by and written about Plaintiff's executives for trade publications and journals, as well as television coverage.[6] Further, virtually every aspect of National Life's corporate life is reported extensively in the Vermont media.[7] This reporting not only includes coverage on National Life's financial and insurance product interests, but also other issues on which Plaintiff chooses to comment.[8] Finally, National Life sends out a multitude of press releases, including press releases to major newspapers in each state proclaiming the dollar amount it yearly distributed in life insurance benefits in that state and touting its high A.M. Best rating.[9]

These voluntary efforts by the Plaintiff to reach out to their "community," coupled with press coverage of Plaintiff's views, constitutes more than adequate access to effective means of communication. *See Reuber,* 925 F.2d at 708 (Plaintiff's lectures and coverage of his views constituted access to effective means of communication).

In addition to these efforts, National Life has an annual communications budget of over $700,000, and during 1988 and 1989, National Life spent in excess of a half a million dollars on extensive advertising of its financial position. This type of budget expenditure demonstrates corporate access to effective means of communication. *See, e.g., Steaks Unlimited v. Deaner,* 623 F.2d 264, 273–74 (3rd Cir.1980) (corporate plaintiff's access to effective channels of communication demonstrated through their advertising spending).

---

5. This prominence existed prior to the alleged defamation. *See* Defendants' Exhibit 21 attached to Supplemental memorandum on Plaintiff's press release on the election of National Life C.E.O. to Board of Directors for the American Council of Life Insurance. The prominence continued after the alleged defamation. *See* Defendants' Exhibits C and D attached to their Reply, Depositions of National Life's C.E.O. Frederick Bertrand at 26 and National Life's President John Harding at 266–67.

6. *See, e.g.,* Defendant Exhibit 22 in Volume I of Exhibits in support of Supplemental Memorandum *The Wall Street Digest,* "Breaking New Ground—The Ideas of Frederick H. Bertrand," 9/90 edition of "Life Association News" at 117 (C.E.O. of National Life "... doesn't mince words about what's wrong with the life insurance industry. He offers some unusual ideas about how to fix it.")

7. *See* Defendants' Exhibit A attached to Defendants' Reply to this Motion.

8. *See, e.g.,* Defendants' Exhibit 25 attached to Supplemental Memorandum of *The Wall Street Digest* on news coverage of National Life's views on state AIDS legislative initiative.

9. Defendants' Exhibits 8, 9, 12, 15, 16 in support of Supplemental Memorandum, *The Wall Street Digest.* For example, in exhibit 12 one press release sent to the Indiana press in May of 1989 states, "National Life of Vermont paid over $8,525,000 to or for its Indiana policy owners in 1988.... In business since 1850, National Life has just received notification that, for the 15th consecutive year, it has been assigned an A + rating by A.M. Best Company, the highest assessment offered by the rating firm." Similar press releases were sent to 34 states.

Finally, National Life's communication's department distributed a monthly public relations magazine called "Contact" to all policy holders, and also distributed a monthly magazine called "Showcase." This type of activity demonstrates effective means of communication. *See Waldbaum,* 627 F.2d at 1299 (D.C. Circuit notes that Plaintiff's corporation's monthly newsletter controlled by Plaintiff and sent to consumers was important for demonstrating media presence).

In spite of this extensive access Plaintiff asserts that effective access was denied, because Defendants would not turn over mailing and subscriber lists or print a retraction. Plaintiff's arguments are unpersuasive. Plaintiff cites no authority for this novel access argument.[10]

Indeed, National Life's characterization of its access misses the point in examining Plaintiff's potential for stating its side of the story to the "public."

> The inquiry into access to channels of communications proceeds on the assumption that public controversy can be aired without the need for litigation and that rebuttal of offending speech is preferable to recourse to the courts.

*Reuber,* 925 F.2d at 708 (citing *Gertz,* 418 U.S. at 344, 94 S.Ct. at 3009). Plaintiff's commanding presence in the insurance industry, with its policyholders, investors, and in its home state provided the "fora where [National Life's] reputation was presumably tarnished and where it could be redeemed." *Reuber,* 925 F.2d at 708. Given Plaintiff's opportunity for effective access to rebut Defendants' claims, this Court is compelled to conclude that Plaintiff has effective access to means of communication. *See Wolston,* 443 U.S. at 164, 99 S.Ct. at 2705 (public figures are less vulnerable to injury because of their access to effective "self help").

The Court now turns to the second prong of the *Fitzgerald* five part limited public figure status test, whether Plaintiff voluntarily assumed a role of special prominence in a public controversy. The Court must define both the public controversy as well as the community wherein Plaintiff was prominent.[11] *See Reuber,* 925 F.2d at 707–09; *Fitzgerald,* 691 F.2d at 669. Defendants maintain that Plaintiff prominently embroiled itself in a public controversy over the financial health of the insurance industry and the comparative financial positions of competing insurers. National Life argues that the prominent role Plaintiff played in commenting on its own financial situation was not a public controversy.

This Court has already stated that Defendants' characterization of the controversy meets Fourth Circuit requirements for a public controversy. It is a controversy the outcome of which affects the general public or some aspect of it. *Veribanc,* 866 F.2d at 688. Its effects are felt by individuals beyond the litigants and direct participants. *See Waldbaum,* 627 F.2d at 1296.

This stage of the inquiry is more empirical, in that the contours of the controversy must be defined by examining whether persons were *actually discussing* some specific question. *Waldbaum,* 627 F.2d at 1297; *see, e.g., Fitzgerald,* 691 F.2d at 669 (Fourth Circuit cites the fact that the national press had covered the military application of trained dolphins as evidence of a public controversy); *Reuber,* 925 F.2d at 707–09 (Fourth Circuit cites the fact that use of the malathion pesticide to eradicate the medfly had been reported in publications of interest to a specialized segment of the population as evidence of a public controversy).

In support of its position, Defendants offer numerous articles from publications

---

**10.** Further, such a requirement might even be frowned upon by the Supreme Court. *The Miami Herald Publishing Company v. Tornillo,* 418 U.S. 241, 258–59, 94 S.Ct. 2831, 2839–40, 41 L.Ed.2d 730 (1974) (in rejecting plaintiff's contention that a newspaper be required to print plaintiff's opposing views the Supreme Court stated, "[a] newspaper is more than a passive receptacle or conduit for news, comment and advertising.")

**11.** Defining these concepts is a difficult endeavor since each can be so malleable. As one court stated, "[d]efining public figures is much like trying to nail a jellyfish to the wall." *Rosanova v. Playboy Enterprises, Inc.,* 411 F.Supp. 440, 443 (S.D.Ga.1976).

across the country, as well as governmental reports, that all call attention to the financial instability of the insurance industry as measured by the many financially shaky companies that comprise that industry.[12] Defendants also provide extensive evidence of the Vermont media coverage on National Life's financial stability.[13]

Plaintiff attempts to rebut Defendants' arguments by redefining the controversy as a purely private matter between the litigants. National Life argues that the controversy about which it may have been involved only concerned its own financial health. Plaintiff claims that beyond the Vermont press, there were no national articles scrutinizing National Life's financial position. Plaintiff argues Defendants created the controversy themselves by publishing the libel.[14] The Court rejects Plaintiff's definition of the controversy. Similar efforts to recharacterize public controversies into purely private disputes have failed. *See National Found. for Cancer Res. v. Council of Better Business Bureaus, Inc.*, 705 F.2d 98, 101 (4th Cir.1983) (*NFCR*) (Fourth Circuit rejects plaintiff's argument that the controversy was not about its solicitation efforts, but only about the reasonableness of defendant's rating of plaintiff's efforts).

Moreover, it would be inappropriate to shrink all controversies to the specific statements of which a plaintiff complains. Defendants' alleged defamatory statements here, as in other controversies, are a part of, and clearly related to, a much larger story. In characterizing the controversy in *Reuber* the Fourth Circuit went beyond the specific alleged libelous statements regarding plaintiff's qualifications as a scientist, and instead characterized the controversy as a broader issue over the carcinogenicity of malathion. 925 F.2d at 707. In *Fitzgerald*, the Fourth Circuit resisted defining the issue as simply plaintiff's particular use of dolphins for military purposes. 639 F.2d 1076–77 (4th Cir.1981). According to the Court, Defendant's article concerned the military's use of animals generally and dolphins in particular. Plain-

**12.** For example, the U.S. House of Representatives Committee on Energy & Commerce issued a report in February of 1990, shortly before any of the alleged defamatory statements, on "Insurance company Insolvencies." *See* Defendants' Exhibit E attached to their Reply. The Congressional Report cites several earlier national studies on company insolvency and compares the plight of this industry to the savings and loan situation. Other articles, Defendant lists from the *New York Times* and *The Washington Post* carry titles such as: "Insurer Insolvencies: Next Mega–Crisis" and "Will Insurance Industry Go the Way of S & L's." In *Forbes*, a national business magazine, an article appeared over nine months before the alleged defamation that specifically showed how numerous large insurance companies had pursued high risk strategies and consequently received lower ratings. *See* Defendants Exhibits F and H attached to the Reply.

**13.** *See* Defendants' Exhibits A and G attached to Reply. *See, e.g.,* "National Life Reaches Insurance Milestone," *Rutland Herald,* 12/12/87 ("National Life of Vermont has announced achievement of a new business milestone: $25 billion of life insurance in force."), "Regulators: National Life is Sound," *Rutland Herald,* 2/8/90 ("Cutbacks planned by National Life of Vermont are due to increased competition in the industry but the company is still in sound financial shape."); "Business Growth," *Times Argus,* 1/14/86 ("At a time when many of the

nation's biggest corporations are squandering resources on non-productive take-overs and mergers, its refreshing to see a company put some money into expansion that will create jobs and help its community."); "National Life Hopes New Austerity Will Restore Old Grandeur," *Rutland Herald,* 2/14/88.

**14.** The Court notes that even if Plaintiff's statement of the controversy could be considered accurate, National Life would likely be held a public figure. Plaintiff touted its financial strength in press releases across the country. Plaintiff raised the issue that its financial strength should be judged, in part at least on its A.M. Best rating. Plaintiff's creation of a controversy through its own actions does not preclude a finding that there was a public controversy. *National Found. for Cancer Res. v. Council of Better Business Bureaus, Inc.,* 705 F.2d 98, 101 (4th Cir.1983) (*NFCR*); *see also, Steaks Unlimited,* 623 F.2d at 273–74. The Court rejects Plaintiff's characterization primarily because Defendants' publications are not about National Life in particular, but about the insurance industry and the financial health of companies that comprise it. Plaintiff took advantage of an existing controversy by casting these statements about its financial condition into the vortex of an existing controversy, Plaintiff voluntarily injected itself into a public debate.

tiff's work was mentioned only as part of a larger article. *Id.*

As in *Fitzgerald*, the controversy is not about the Plaintiff in particular. The alleged defamation mentions National Life as part of an article covering more ground than simply Plaintiff's situation. As the Fourth Circuit made clear in rejecting a similar effort by a plaintiff to redefine the debate, the key to the public figure test is "the party's own conduct." *NFCR*, 705 F.2d at 101.

Next, the Court must examine whether Plaintiff is a prominent member of the community. *See Reuber*, 925 F.2d at 709. The Court finds that National Life is a prominent member of the community. Here, Plaintiff's community is defined with respect to the specialized audience familiar with this controversy and who would be probable readers of the promotional materials and publications. *Id.* ("Someone who has not attracted general notoriety may nonetheless be a public figure in the controversy covered by the publications of specialized interest."); *see, also Reliance Insurance Co. v. Barron's*, 442 F.Supp. 1341, 1349 (S.D.N.Y.1977) (insurance company that is "probably ... well known among *Barron's* readership" is a public figure) (disagreed with on other grounds *Veribanc*, 866 F.2d at 688).

Defendants maintain, and it is not contradicted[15], that the promotional materials were sent to a targeted audience, *i.e.*, those with a demonstrated interest in this type of investment newsletter. Further, the actual circulation for *Profitable Investing* and *The Wall Street Digest* is limited to the investment community. National Life, however, is among the largest mutual life insurance companies in the nation with over $4 billion in assets and $25 billion in

insurance policy coverage. National Life has a nationwide network of agents marketing its products and touting its financial status. When the bald facts of Plaintiff's corporate size are coupled with its' press coverage, its' leadership in national insurance organizations, and its' extensive national advertising, National Life's prominence in this community is undisputed. *See Id.; Waldbaum*, 627 F.2d at 1300 (an executive whose actions were covered by a trade publication was held to be a public figure given the size of the corporation for whom he worked, his control over a company publication, and his controversial policies).

Finally, National Life itself struts its own prominence in its advertizing and news articles.[16] Such self definition as been considered a factor for determining prominence in the community. *See Reuber*, 925 F.2d at 709 ("Moreover, [plaintiff] described himself as 'eminent' in his field.").

The Court must next consider Plaintiff's voluntary efforts to influence the outcome of this public controversy. Evaluating Plaintiff's voluntary efforts is the most important factor in considering public figure status. *Veribanc*, 866 F.2d at 686–87. This conclusion rests on the "normative consideration that public figures are less deserving of protection than private persons because public figures, like public officials, have 'voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them.'" *Wolston*, 443 U.S. at 164, 99 S.Ct. at 2706 (citations omitted); *see also Reuber*, 925 F.2d at 709.

Plaintiff made extensive efforts to voluntarily inject itself into the vortex of public opinion over the comparative financial health of insurance companies. First, and

---

**15.** Both Plaintiff, as well as Defendants, maintain that the promotional materials were sent to a targeted audience. "The ads were specifically directed at potential purchasers of Phillips' and Band's product, encouraging these people to purchase a newsletter subscription and thereby increase Phillips' and Band's revenues." Plaintiff's Memorandum in Opposition to Supplemental Memoranda Filed by Defendants on its Public Figure Status at 13.

**16.** *See, e.g.,* Defendants' Exhibit B attached to Reply. Advertisement from the *Wall Street Journal*, May 1990 ("Our business is life insurance—a grand old American tradition. We're secure, successful and growing, with a 140-year history of integrity and reliability. Year after year our strong financial position and performance have earned us an A + rating from A.M. Best, ... In short *as big league life insurance companies go,* we're batting a thousand.") (emphasis added)

foremost, Plaintiff engaged in a national advertising campaign extolling its financial strength and, in particular, its strength as measured by the A.M. Best rating company.[17] These ads were sent to major newspapers and insurance industry publications in at least thirty-four states. Next, Plaintiff repeatedly informed its quarter of a million policyholders and its nationwide network of agents about its financial strength and A.M. Best rating. Finally, corporate executives defended and gave assurances in numerous articles, that Plaintiff's austerity measures, taken in the late 1980's, would improve National Life's financial health.[18] These actions have been held by the Fourth Circuit to constitute voluntary efforts. *See Reuber,* 925 F.2d at 710 (plaintiff voluntarily entered controversy by writing a report and disseminating his views to interested parties); *NFCR,* 705 F.2d at 101 (plaintiff's own solicitation efforts were an important factor in Fourth Circuit's determination that NFCR was a public figure); *Steaks Unlimited,* 623 F.2d at 264 (plaintiff's own advertizing efforts were a critical factor in Third Circuit determination of plaintiff's public figure status).

In response to these arguments, Plaintiff offers two counter assertions. First, Plaintiff attempts to compare its situation with the Fourth Circuit analysis in *Veribanc.* In *Veribanc,* National Life maintains that plaintiff had engaged in some advertising, but was found not to be a public figure.

However, *Veribanc* is distinguishable. In *Veribanc,* the Fourth Circuit noted the lack of a direct relationship between the promotional message in plaintiff's advertisements and the subsequent defamation. *Veribanc,* 866 F.2d at 687 (plaintiff's ads did not raise the bank's corporate financial health which was the subject of defendant's report).

In the instant case, the particular claims made by National Life were clearly made to influence the outcome and take advantage of the existing public controversy. At a time when much doubt was cast on the ability of insurance companies to meet financial commitments, National Life touted its asset strength, age, financial size and extolled its high A.M. Best rating, all in an effort to show that it was not encumbered by the difficulties exhibited in other companies. Such claims, and their direct relationship to plaintiff's participation in its controversy, have been important in establishing public figure status. *NFCR,* 705 F.2d at 101; *see also Waldbaum,* 627 F.2d at 1298 (an examination of plaintiff's qualifications bears a direct relationship to the public's decision over how to evaluate plaintiff's comments). Further, as in *Reuber,* Defendants, here, questioned Plaintiff's qualifications by criticizing the very evidence Plaintiff offered to demonstrate its claims, *i.e.,* Defendants' criticized Plaintiff's A.M. Best rating. 925 F.2d at 707–10.

National Life also maintains that it voluntarily sought no public controversy, it was only engaged in the typical business promotional actions done by any corporation.[19] Under Fourth Circuit precedent, this argument must be rejected. The fact that Plaintiff did not realize its actions might draw critical scrutiny is irrelevant. What is relevant is that the Plaintiff voluntarily chose a course of conduct that invited public attention.[20] *See Reuber,* 925 F.2d at 709–10. Any other view of "voluntary efforts" would, as the Fourth Circuit points out, mean that a plaintiff could knowingly disseminate views to combatants in a public controversy and then run and hide when its credentials and views were vigorously chal-

---

**17.** *See* supra note 9.

**18.** *See,* Defendants' Vol. II Exhibits 37, 38 & 42 attached to Supplemental Memorandum.

**19.** Arguments made by Plaintiff implying that National Life, should, as a corporation, be treated differently are examined more fully *infra* page 640.

**20.** The Court here does not rely on the fact that National Life is part of a regulated industry or is a large corporation. Such factors were relevant for determining, along with other facts, Plaintiff's prominence and the existence of a public controversy. *See Veribanc,* 866 F.2d at 689 n. 13. However, these facts are insufficient to establish public figure status. *Id.* at 687–688.

lenged. *Id.* The law does not provide such an artificial shield. *Id.*[21]

▪ The fourth prong of the *Fitzgerald* test examines whether the controversy existed prior to the alleged defamatory statements. Plaintiff claims it did not. However, Plaintiff's argument rests entirely on their being able to recharacterize the controversy from the public debate this Court has already identified, to what Plaintiff considers a private controversy, solely surrounding National Life's financial status. This Court has already identified the controversy as a discussion over the financial health of the insurance industry as measured by the financial health of the companies that comprise the industry.[22]

Defendants have offered many articles from national newspapers, insurance industry trade publications and government reports that predate the alleged defamatory statements.[23] Under Fourth Circuit precedent, this constitutes the controversy's pre-existence. *Reuber*, 925 F.2d at 710; *Fitzgerald*, 691 F.2d at 669. Plaintiff counters, however, that Defendants were unaware of National Life before the institution of this suit. Whether or not Plaintiff is correct in their assertion is not relevant. *See Reuber*, 925 F.2d at 710. (Fourth Circuit rejects author's subjective intent in favor of an objective approach in determining whether the alleged defamation is related to a prior public controversy).

As the final prong of the *Fitzgerald* test, Plaintiff must retain public figure status at the time of the alleged defamation. *Fitzgerald*, 691 F.2d at 668. Plaintiff clearly did. Plaintiff's access to the media did not change. Further, neither did their prominence in the community. Finally, Plaintiff continued to engage in many voluntary efforts in order to influence the outcome of the controversy. Indeed, Plaintiff's efforts immediately after the first of the allegedly libelous articles clearly demonstrate the "self help" opportunities available to National Life.[24]

### D. Applying the Public Figure Test to Corporations

Under the *Fitzgerald* standard, Plaintiff should be considered a public figure and should be required to show that Defendants acted with malice. However, Plaintiff makes two additional arguments against using the malice standard when examining Defendants' conduct. The first argument is implied by the Plaintiff, *i.e.*, that corporations should not be subjected to the same standard as individuals when determining a public figure. The second argument is that the statements made by

21. *Id.* In part, what Plaintiff may be arguing is that corporate plaintiffs should have a different public figure test applied when reviewing their status. Such assertions are also rejected by the Court. *See infra* page 640.

22. Moreover, even if Plaintiff were correct in their redefinition of the controversy, it is likely that it existed prior to the defamatory statements. Numerous articles appeared in the Vermont media that challenged the financial health of National Life. National Life responded by issuing press releases nationally. In particular, National Life issued press releases nationally regarding its financial health as measured by its A.M. Best rating. *See supra* notes 9, 12 & 13 and Defendants' Exhibit A & M attached to the Reply.

23. *See supra* note 11.

24. National Life sent each policy holder a letter touting its financial strength immediately following the first of the allegedly defamatory publications. *See* Defendants' Exhibit J attached to the Reply. Further, National Life wrote its na-

tionwide network of general agents advising them as to how to respond to Band's March 1990 article. *See* Defendants' Exhibit K attached to the Reply. National Life spent $30,000 in May of 1990, on an ad in the *Wall Street Journal.* In the ad, National Life identifies itself as "big league" insurance company, extols its financial strengths touts its A.M. Best rating. *See* Defendants' Exhibit B attached to the Reply. Finally, National Life's executives continued in prominent positions in the insurance industry and continued to speak out in national industry publications. *See supra* notes 5 and 36. For example, an article on Plaintiff's CEO stated, "Industry image is something Bertrand cares deeply about. It's the primary reason he chairs ACLI's committee on Public Relations. And when a national financial newsletter recently threatened the image of his own company by implying that National Life was financially unstable, Bertrand filed suit." Defendant Exhibit 22 in Volume I of Exhibits in support of Supplemental Memorandum The Wall Street Digest, "Breaking New Ground—The Ideas of Frederick H. Bertrand," 9/90 edition of "Life Association News" at 118.

Defendants Band and Phillips in the promotional materials should not be judged against the malice standard because they are commercial speech. Both arguments are based on Plaintiff's assertion that allegedly defamatory statements in a commercial context should receive different treatment. Each argument will be considered in turn.

■ Plaintiff argues that in promoting its own business enterprise through typical corporate actions it was simply responding to market competitive pressures and therefore its actions do not constitute the voluntary efforts required to establish public figure status. As the Court has already noted, such an argument fails when applying Plaintiff's efforts to the standard used for individual actions. However, whether the *Gertz* and *Fitzgerald* public figure/private figure distinction applies to a corporation has not been explicitly addressed by the Supreme Court.[25] Similarly, circuit decisions have been mixed.[26] This Court rejects Plaintiff's implied argument. At the very least, the same public figure standard that applies to individuals should apply to corporations. Corporations should not be given a greater right than an individual to protect their reputation and silence speech.

Plaintiff's argument for a stricter corporate public figure test focuses on National Life's claim that its actions were in response to market pressures and business necessity. As Plaintiff states, "every corporation is directly involved in its own financial health ... While any company's financial health is of concern to its employees, its shareholder and its creditors, that generalized concern does not amount to a particular controversy." Plaintiff's Opposition at 14. Plaintiff cites *Veribanc*, 866 F.2d at 688, "[T]he existence of an ongoing public interest in the stability of society's financial institutions and markets ... [does not elevate] every member of the regulated class to public figure status." [27]

Plaintiff's argument fails. First, Plaintiff's argument probably runs against Fourth Circuit precedent. Although the Fourth Circuit has not explicitly stated that *Gertz* applies to corporate plaintiffs, it applied the *Gertz* standard to a corporate plaintiff. *See Veribanc*, 866 F.2d at 681 (where Fourth Circuit applied the *Fitzgerald/Gertz* standard to a corporate plaintiff).

Second, while Plaintiff views its business actions as a purely private affair, not constituting a voluntary insertion into a public controversy, the same could be said of individual plaintiffs. In *Fitzgerald*, plaintiff's voluntary conduct, the Circuit Court reasoned, was done in an effort to make money. Like National Life, he was responding to market pressure. *Fitzgerald*, 691 F.2d at 669. However, his public statements and brochures hawking his wares did not shield him from the *Fitzgerald/Gertz* analysis. *Id.* To a certain extent, the same could be said of *Reuber*. *See Reuber*, 925 F.2d at 703. In *Reuber*, plaintiff's

---

**25.** *See Bose Corp. v. Consumers Union*, 466 U.S. 485, 492 n. 8, 104 S.Ct. 1949, 1955 n. 8, 80 L.Ed.2d 502 (1984) (Supreme Court declined to pass on merits of a lower court finding that the corporate plaintiff involved was a public figure).

**26.** *Cf. Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d 583 (1st Cir.1980); *Steaks Unlimited* 623 F.2d at 264 (cases applying the *Gertz* public figure test to corporations) and *U.S. Healthcare v. Blue Cross of Greater Philadelphia*, 898 F.2d 914 (3rd Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 58, 112 L.Ed.2d 33 (1990) (although the corporations involved in the suit would be public figures under the traditional *Gertz* analysis, the Third Circuit declined to make such a finding).

**27.** Lurking behind Plaintiff's argument is the Third Circuit holding in *U.S. Healthcare* that stated that even though Plaintiff was a public figure under the *Gertz* standard, that test had limited applicability when used to evaluate a corporate plaintiff in a corporative advertising campaign. *U.S. Healthcare*, 898 F.2d at 938–39. Plaintiff's argument, as will be discussed later, turns in part on its assertion that the promotional materials were, as the Third Circuit held in *U.S. Healthcare*, commercial speech. As such, that Court maintained that focusing on a plaintiff's status as *Gertz* requires will have limited applicability because corporations, out of business necessity, will always seek out media and place themselves in the public eye in order to respond to competitor pressure and statements. *Id.* at 939 ("We believe that a [plaintiff] corporation must do more than claimants have done

actions in disseminating his scientific findings could be construed as merely attempting to respond to the dictates of his field which prospers through the spread of empirical studies. *Id.* Further, *National Foundation for Cancer Research* could also fall within National Life's argument in that, NFCR must make expansive solicitations in order to raise money to fight cancer. *See NFCR,* 705 F.2d at 98.

Acceptance of Plaintiff's argument that corporations should be judged by different rules leads to chaos. Using National Life's rationalizations, there is no principled way to separate corporate from individual plaintiffs. Every plaintiff would require a different standard for defining its public or private figure status.

Third, allowing corporations to play by different rules in a defamation case is simply not fair. Maintaining balance between the "breathing space" necessary for robust debate in the marketplace of speech and protecting individual and corporate reputation is admittedly difficult. The value of protecting one's reputation has long been recognized. "Who steals my purse steals trash. 'Tis something, nothing; 'Twas mine, 'tis his, and it has been slave to thousands; But he that filches from me my good name, robs me of that which not enriches him, and makes me poor indeed." [28] A state's legitimate interest in compensating harmed private figure plaintiffs is vital. *See Gertz,* 418 U.S. at 341, 94 S.Ct. at 3007.

But there is absolutely no reason to elevate the protection of corporate reputation interests over those of the individual. While corporate reputation interests are indeed important, it is difficult to see how the damage to the corporate bottom line is more sacrosanct than the harm defamation can cause to an individual's human dignity, a quality a corporation is unlikely to have acquired even given its stature as a "person" under the constitution. *See First Nat. Bank of Boston v. Bellotti,* 435 U.S. 765, 777, 98 S.Ct. 1407, 1416, 55 L.Ed.2d 707 (1978). The marketplace of ideas should be allowed in all areas including the marketplace of commercial products. Moreover, the Supreme Court has held that corporations enjoy virtually the same right of speech as an individual. "The inherent worth of the speech in terms of its capacity for informing the public does not depend upon the identity of its source, whether corporation, association, union or individual." *First Nat. Bank of Boston v. Bellotti,* 435 U.S. 765, 777, 98 S.Ct. 1407, 1416, 55 L.Ed.2d 707 (1978). Indeed, it would be an ironic twist of reasoning to hold that the principles that underlie the marketplace of ideas metaphor should be discarded when the limelight of public discussion focused on the marketplace in commerce.

Finally, a different corporate defamation standard could run afoul of clear constitutional precedent. The standard the Plaintiff suggests would make it easier for corporations to prove defamation. If the Defendants' speech, as it is in this case, is noncommercial speech commenting on corporate commercial speech, a different defamation standard would effectively elevate commercial speech over noncommercial speech. This is so because public comment on corporate action would be judged by a harsher standard than corporate commercial speech. Corporate commercial speech would be given a freer hand as public comment about it was chilled. This anomalous result could violate Supreme Court precedent because it would elevate commercial over the noncommercial speech. *See Central Hudson Gas & Electric Corp. v. Public Service Comm'n of New York,* 447 U.S. 557, 562–63, 100 S.Ct. 2343, 2349–50, 65 L.Ed.2d 341 (1980). For these reasons, therefore, the Court declines National

---

here to become a limited purpose public figure").

**28.** Shakespeare, *Othello,* III·iii 157–61 (Iago). Oddly, in the case of corporation defamation, the damage to reputation is primarily, if not completely monetary, *i.e.,* damage to the corporate purse. *See, e.g., Bose Corp. v. Consumers U.*

*of U.S.,* 508 F.Supp. 1249, 1270 (D.Mass.1981) (overturned in part, on its holding that *all* corporations should be considered public figures). ("... a manufacturer's interest in the reputation of its product [is] an interest not nearly as significant as an individual's interest in his personal reputation and hardly 'at root of any decent system of ordered liberty'").

Life's invitation to give special treatment to corporate plaintiffs.

### E. Defamation and Commercial Speech

National Life contends that even if it is a public figure, the malice standard should not be applied to all of Defendants' statements. Band's statements and Phillips' publications that comprise the promotional or marketing materials [29] constitute commercial speech, according to National Life.[30] As commercial speech, Plaintiff argues, the publications should not be protected by the malice standard. *U.S. Healthcare, Inc. v. Blue Cross*, 898 F.2d 914 (3rd Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 58, 112 L.Ed.2d 33 (1990). Plaintiff's argument rests, therefore, on first classifying the promotional materials as commercial speech, and second on shifting the focus of defamation analysis away from consideration of a plaintiff's status and the libel's relation to a public controversy, to an examination of the subject matter of a defendant's statements.

1) *Allegedly Defamatory Statements Ensconced in Defendants' Promotional Materials are Not Commercial Speech*

■ Plaintiff's characterization of Defendant's statements as commercial rests largely on the fact that the statements about National Life contained in the newsletter are reprinted in promotional materials. The promotional or marketing materials were sent to potential subscribers.[31] It is not the statements themselves, but rather the packaging they came in that, for Plaintiff, transforms the statements from the safe haven of protected noncommercial speech to an arena of lesser protected commercial statements. For Plaintiff, the fact that the Band statements are lodged in a marketing letter proposing a commercial transaction, *i.e.*, buying of Band's newsletter, made the statements commercial. Plaintiff claims that the promotional materials are commercial, because they relate to economic interests of audience and speaker and refer to a specific product—*Profitable Investing*. Plaintiff's broad definitional sweep would, if applied without further thought, transform too much noncommercial speech into commercial statements.

Defendants' promotional materials are far more than merely proposals to engage in a commercial transaction and their characterization presents a much closer question than 'common sense' distinctions the Supreme Court has relied upon. *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 455–56, 98 S.Ct. 1912, 1918–19, 56 L.Ed.2d 444 (1978).

As a starting point, the mere fact that the statements appear in advertisements does not compel the conclusion that the statements are commercial. *New York Times v. Sullivan*, 376 U.S. 254, 265–66, 84 S.Ct. 710, 718–19, 11 L.Ed.2d 686 (1964) (Supreme Court held speech at issue not commercial even though it appeared in an advertisement soliciting funds in the *New York Times*); *see also Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 66, 103 S.Ct. 2875, 2880, 77 L.Ed.2d 469 (1983). Further, Plaintiff's assertion that the promotional materials refer to a specific product—the newsletter *Profitable Investing*,

---

**29.** Plaintiff refers specifically to the *Launce Package*, the *April Bulletin*, the *May Bulletin*, and the (revised *May Bulletin*).

**30.** As *The Wall Street Digest* did not participate in writing, sending, or publishing the promotional materials, and as such National Life's argument on commercial speech does not in any way affect Defendant Digest.

**31.** National Life's characterization of Defendants' analysis as commercial speech also rest on its assessment of the statements as "teasing, truncated highlights of Richard Band's investment advice." Plaintiff's Opposition to Supplemental Memorandum at 14. Defendants have stated that the "marketing letters directly summarize" the statements in *Profitable Investing*. The Court notes that to the extent Band's alleged defamatory statements are presented in abbreviated form in the marketing letters, they may not be actionable at all. The *April Bulletin* that markets the newsletter appears to mention the Plaintiff only once in a statement that seems to be inactionable opinion. "The Bonus report tells you how to check out the fiscal soundness of your own life insurance companies. It lists many of the weakest, including for example ... National Life (Vermont), ..." *See* Plaintiff's Exhibit 2 attached to Opposition to the Motion for Summary Judgment at 15.

is not dispositive. *Bolger,* 463 U.S. at 66, 103 S.Ct. at 2880.

Moreover, Defendants' economic motivation for sending the promotional materials to the potential subscribers is not enough to turn the statements into commercial speech. *Bolger,* 463 U.S. at 67, 103 S.Ct. at 2880. *See also Joseph Burstyn, Inc. v. Wilson,* 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098 (1952) (Supreme Court rejected the contention that motion pictures should not receive First Amendment protection because they are made and exhibited for profit). The idea that financial gain is associated with matters involving protected speech does not jeopardize its standing. *Murdock v. Pennsylvania,* 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943) ("the mere fact that religious literature is 'sold' by itinerant preachers rather than 'donated' does not transform evangelism into a commercial enterprise.").

While *Bolger* suggests that the presence of all of these qualities provides support for concluding that the speech is commercial, the Supreme Court has examined closely the purpose of the message. 463 U.S. at 67–68, 103 S.Ct. at 2880–81; *New York Times,* 376 U.S. at 266, 84 S.Ct. at 718.

In *New York Times,* the advertisement was not classified as commercial speech because it, "communicated information, expressed opinion, recited grievances, protested classified abuses, and sought financial support" on behalf of the civil rights movement. *New York Times,* 376 U.S. at 266, 84 S.Ct. at 718. On the other hand, in *Bolger,* the Court classified the speech as commercial because the advertising merely linked a product to a current public debate. *Bolger,* 463 U.S. at 68, 103 S.Ct. at 2881.

In the instant case, it is not the promoting of the newsletter per se which gives rise to Plaintiff's complaint. Nor is Plaintiff suggesting that Defendants here are any less entitled than the civil rights defendants in *New York Times* to express opinions, recite grievances, or protest classified abuses (only in this case the abuses are about the insurance industry). Unlike *Bolger,* but like *New York Times,* the appearance of Band's analysis in the promotional material is only an incidental consequence. The content of the statements bears no direct relationship to the product, the newsletter, that is being sold. *Cf. U.S. Healthcare,* 898 F.2d at 934 (Third Circuit applies three part test outlined in *Bolger* for determining whether the speech is commercial holding that the second prong requires that the speech refer to a product). The speech at issue here does not make any reference to the product.[32] Defendants' statements should not, therefore, be classified as commercial speech under the *Bolger* test. 463 U.S. at 66, 103 S.Ct. at 2880. *See also U.S. Healthcare,* 898 F.2d at 934.

Plaintiff's complaint is over the fact that the statements were made, not over where they happen to appear. These are not statements that attempt to draw or link a public controversy to a product in order to immunize its advertising from stricter scrutiny. *See Central Hudson,* 447 U.S. at 563 n. 5, 100 S.Ct. at 2350 n. 5. Rather, these are statements that were made, as the previous analysis on Plaintiff's status demonstrates, in the context of a public controversy, and it is only their chance appearance in the promotional materials that brings any color at all to "the cheeks" of Plaintiff's argument. Such a fortuity should not transform the character of their content into commercial speech, just as the quality of wine does not depend on the shape of the vessel in which it is carried.

As Defendants point out, this commercial speech definition would yield a result that commentators on national issues could enjoy the uninhibited, robust debate guaranteed by *New York Times* and *Gertz* only so

---

32. It is also the subject of dispute as to whether the statements meet the third prong of the *Bolger* test—does the speaker have an economic motivation for the speech. National Life claims that Band trumped up the insurance controversy in order to sell his newsletter. Profit, Plaintiff maintains, not the desire to inform, drove him to comment on National Life. There is scant evidence for Plaintiff's claim. Further, Plaintiff's own motives for bringing suit could be impugned since a flurry of press releases from Plaintiff notifying the public of this suit followed the filing.

long as their statements did not happen to be reprinted in advertisements for their books, articles and television programs.[33] This definition of commercial speech would severely cloister the virtues articulated in these decisions. "If a profit motive could somehow strip communication of otherwise available constitutional protection, our cases from *New York Times* to *Hustler Magazine* [*v. Falwell*, 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988) ] would be little more than empty vessels." *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 667, 109 S.Ct. 2678, 2685, 105 L.Ed.2d 562 (1989). For these reasons, this Court holds that the statements in the promotional materials are not commercial speech and should not receive any different treatment than the other statements contained in Defendants' publications.

2) *The Mere Identification of Speech as "Commercial" Cannot Determine the Degree of Fault to Apply to Defendants' Conduct*

 Beyond Plaintiff's mistaken classification of the promotional materials, there are other compelling reasons to reject National Life's argument. National Life, relying on the Third Circuit's opinion in *U.S. Healthcare*, makes a novel argument that a plaintiff need not demonstrate that a defendant acted with malice when a defendant's statement is contained in commercial speech. *U.S. Healthcare*, 898 F.2d at 939. "In summary, the speech at issue [speech classified as commercial] does not receive heightened protection under the First Amendment. 'Because this speech is chill-resistant, the *New York Times* standard is not ... necessary to give adequate breathing space to the freedoms protected by the First Amendment.' " *U.S. Healthcare*, 898 F.2d at 939 (citations omitted).

National Life's reasoning rests on a correct conclusion taken out of context. National Life correctly notes that commercial speech receives less protections than noncommercial speech, but Plaintiff's analysis is incomplete. *See Central Hudson*, 447 U.S. at 562–63, 100 S.Ct. at 2349–50; *Virginia Pharmacy Board v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771–72, n. 24, 96 S.Ct. 1817, 1830–31, n. 24, 48 L.Ed.2d 346 (1976).

Since National Life would apply reduced protection to the speech regardless of Plaintiff's status as a public figure, commercial speech defines the new boundary between robust debate and reputation. *See also, U.S. Healthcare*, 898 F.2d at 937 ("[W]hile [commercial speech] is protected by the First Amendment, it requires no higher standard of liability than that mandated by the substantive law ..."). Commercial speech becomes the talisman Plaintiff uses for determining when First Amendment values in robust debate must yield to reputation interests. If the speech is classified as commercial it gets disparate treatment under Plaintiff's defamation scheme. According to Plaintiff, because commercial statements receive less First Amendment protection, a defendant's conduct and statements are automatically judged against a negligence standard, and not the traditional malice standard, that is applied when plaintiff is a public figure.

National Life's argument falters on its own incomplete understanding of commercial speech analysis. The classification of speech as commercial is the beginning, not the end, of the Supreme Court analysis. Before commercial speech is restricted, the value of the commercial speech is evaluated against the particular state interest the restriction is designed to foster. *See e.g., Bolger*, 463 U.S. at 66–74, 103 S.Ct. at 2880–84. "The protection available for particular commercial expression turns on the nature both of the expression and of the governmental interests served by the regulation." *Id.* (quoting *Central Hudson*, 447 U.S. at 563, 100 S.Ct. at 2350); *see also Virginia Pharmacy*, 425 U.S. at 748, 96 S.Ct. at 1819.

---

**33.** If Gary Wills' or William F. Buckley's analysis of an issue was moved from a book or magazine interior, to the jacket cover, Plaintiff would have the speech's protection reduced simply because of the change in "venue." Such a change of location should not alter the law that governs the dispute.

What Plaintiff fails to recognize is that the diminished protection accorded commercial speech only justifies the application of a different test to evaluate the speech. The balancing of the substantial government interest against the restriction's limitation on commercial speech still occurs. *See Central Hudson*, 447 U.S. at 563–66, 100 S.Ct. at 2350–51. Weighing the value of commercial statements against the value of a restriction is done even though the restriction is identified as promoting a substantial government interest.[34] *Central Hudson*, 447 U.S. at 564, 100 S.Ct. at 2350 ("The State must assert a substantial interest to be achieved by restrictions on commercial speech.").

The identification of a statement as commercial does not leave it naked, without any First Amendment clothing to protect it. *See Virginia Pharmacy*, 425 U.S. at 748, 96 S.Ct. at 1819. If mere identification of speech as "commercial" justified its restriction, as Plaintiff argues, then many current Supreme Court decisions would have to be overturned. *See e.g., Bolger*, 463 U.S. at 60, 103 S.Ct. at 2877 (Supreme Court strikes government restriction prohibiting the unsolicited mailing of contraceptive advertisements); *Central Hudson*, 447 U.S. at 563, 100 S.Ct. at 2350 (Supreme Court strikes New York regulation that banned all public utility advertising promoting the use of electricity); *Virginia Pharmacy*, 425 U.S. at 748, 96 S.Ct. at 1819 (Supreme Court struck state regulation that made it illegal to advertise prescription drug prices); *In re R.M.J.*, 455 U.S. 191, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982) (Supreme Court struck various restrictions on attorney advertising). These decisions demonstrate that commercial speech interests are not always sacrificed for the sake of a substantial government interest. Therefore, even when the compensation of individuals harmed by defamatory statements is considered a substantial state interest, that interest in reputation must be weighed against the not inconsequential value of the commercial speech.

Plaintiff's truncated commercial speech analysis would leave a stump where important speech interests once stood. In using the mere identification of commercial speech as the analytic tool, Plaintiff operates with a meat cleaver instead of a scalpel, and would amputate much of the core of protected speech from the body of the First Amendment; and all of this would be done in the name of protecting its own good name and reputation.

Plaintiff's analysis is also crippled by the incompatibility between the Supreme Court tests used to evaluate commercial speech and defamation. The Court's assessment of the validity of a restriction on commercial speech is conducted within the confines of the *Central Hudson* test. 447 U.S. at 563–66, 100 S.Ct. at 2350–51. The first prong of that test states that for commercial speech to receive First Amendment protection the statements, "must be neither misleading nor related to unlawful activity." *Id.* at 564, 100 S.Ct. at 2350.

Applying the first prong of the *Central Hudson* test to defamation might lead one, without more thought, to conclude that commercial speech, once identified, should always yield to any reputation interest, since defamation is always false or misleading.[35] Indeed, that appears to be, in part,

---

**34.** As the Third Circuit recognized, this evaluation of commercial speech is usually done when government action or restrictions limit or regulate the commercial speech. *U.S. Healthcare*, 898 F.2d at 932. However, the Third Circuit and the Plaintiff still proceed with the proposition that, "the subordinate valuation of commercial speech is not confined to the government regulation line of cases." *Id.* Therefore, even in a defamation case between two private litigants the diminished protection given commercial speech should apply. As such, the substantial state interest identified, in this application of the commercial speech doctrine to defamation, is the compensation for damage to one's reputation. The question is when should a defendant's statements, because they are commercial speech, yield to a plaintiff's reputation interests and be evaluated against a lower fault standard than malice.

**35.** However, the alleged defamatory statements could in this case be classified as passing the first prong of the *Central Hudson* test, because the alleged defamatory statements do not give the promotional materials their commercial character. The commercial character, if at all, comes from being placed in the promotional materials. As such, the focus of the *Central*

what Plaintiff concludes, *i.e.*, that a defamatory commercial statement is without constitutional protection because it is false.[36] Such a conclusion, however, is wrong.

Applying the *Central Hudson* commercial speech test to defamation underscores an inherent difficulty when these two lines of analysis are conflated. While defamation tolerates some false statements, in order to give the First Amendment the "breathing space" it requires, commercial speech apparently does not forgive false speech so easily. *Cf. Gertz*, 418 U.S. at 340, 94 S.Ct. at 3007 (although erroneous statements of fact do not warrant constitutional protection, applying the malice standard to public figure plaintiffs is predicated on the recognition that error is "inevitable in free debate"); with *Central Hudson*, 447 U.S. at 564, 100 S.Ct. at 2350 ("... there can be no constitutional objection to the suppression of commercial messages that do not accurately inform ..."). If we are to adopt Plaintiff's reasoning and shift defamation analysis away from a plaintiff's status to a subject matter classification of defendants' statements, then more work will need to be done in order to make these two areas consistent with one another.

Indeed, Plaintiff's acceptance of negligence as the standard against which to judge Defendants' statements in the promotional materials is a generous concession. Under the commercial speech standard in *Central Hudson*, as applied by Plaintiff, *any* error, negligent *vel non*, would be actionable. Nothing but clear constitutional principles articulated in *Gertz* prevents such a conclusion if the logic of Plaintiff's position is accepted. *See Gertz*, 418 U.S. at 346–47, 94 S.Ct. at

3010 (states may not impose liability without fault to defamatory falsehood injurious to private figures).

Moreover, Plaintiff's use of commercial speech as the litmus test for defeating the application of the malice standard to a Defendants' conduct inappropriately equates all reputation interests. Since National Life maintains that defamation ensconced in commercial speech is automatically subject to the negligence standard, then all reputation interests are treated alike. Such a conclusion runs counter to precedent. *See Gertz*, 418 U.S. at 346, 94 S.Ct. at 3010. The Supreme Court has rejected the holding that a private individual could be transformed into a public figure just by association with a matter that attracts public attention. *Id.; Wolston*, 443 U.S. at 167, 99 S.Ct. at 2707. What Plaintiff argues is that a public figure who, like National Life, voluntarily inserts itself into the vortex of a public controversy, may still regain increased protections of private figure status if the statements are deemed commercial speech. The subject matter of the statements becomes the tail that wags the dog.

However, this conclusion is wrong. Even *U.S. Healthcare* recognized that a state has only a " 'limited' interest in compensating public persons for injury to reputation by defamatory statements, but has a 'strong and legitimate interest' in compensating private persons for the same injury." 898 F.2d at 930. Plaintiff's analysis does not recognize the different interest the state has in compensating individuals depending on their status. Plaintiff's

---

*Hudson* analysis could be on the terms of sale of the Defendants' publication, which is what, for the Plaintiff, turns these statements from noncommercial into commercial speech. *See Bolger*, 463, U.S. at 69, 103 S.Ct. at 2881 ("The state may deal effectively with false, deceptive or misleading *sales techniques*.") (emphasis added). There is no charge here that Defendants were misrepresenting or misleading potential subscribers in the terms of offer for the sale of the newsletter. Therefore, Defendants' publications would pass the first prong of the *Central Hudson* test.

**36.** Plaintiff argues that "Because such commercial speech is economically motivated, precisely calculated, developed over time and unusually verifiable, First Amendment concerns are greatly diminished. Accordingly, such speech, if false or misleading, is entitled to *no* constitutional protection. For these reasons, the *New York Times* standard does not apply to The Advertisements [Defendants' promotional materials], and National Life need only prove that the defamatory statements contained therein were published negligently." Plaintiff's Opposition at 8 (citations omitted).

analysis clearly runs counter to *Gertz* and the *New York Times*.

The problems associated with Plaintiff's lack of sensitivity to differences in the value of different types of commercial speech, the value of different reputation interests are compounded by Plaintiff's broad definition of commercial speech. Under Plaintiff's analysis, a factually inaccurate statement about the President, or any government official, contained in a news story on "60 Minutes" could be transformed into commercial speech if that statement became part of an advertisement to promote the show. Such a holding would severely curtail core First Amendment freedoms that by any measure protect political speech.

Finally, Plaintiff's probing inquiry into the subject matter of the speech should perhaps engender an equally searching analysis into the value of the protected reputation interest. If commercial interests can so easily devalue the speech interest, why cannot those same commercial interests diminish reputation's value? A corporation's reputation interest is primarily commercial. To paraphrase Shylock, "If you prick them they do not bleed." [37] Nor do corporations have the same intense interest in dignity that so defines society's interest in protecting private individual plaintiffs. Plaintiff's desire not to sacrifice reputation for commercial interest could easily be turned around in this case. Perhaps speech should not be sacrificed when only commercial reputation is at issue.

The Supreme Court has confronted this difficult issue before. Previous attempts at making the subject matter of the speech the touchstone of defamation analysis have been rejected. *See Wolston*, 443 U.S. at 167, 99 S.Ct. at 2707; *Gertz*, 418 U.S. at 346, 94 S.Ct. at 3010 (Supreme Court rejects the *Rosenbloom* standard that focused on whether the defamation was of interest to the general public). Such attempts would require judges to proceed along the perilous route of weighing which topics within commercial speech are so important as to outweigh the value of a particular reputation interest. But as the Supreme Court has stated, "[w]e doubt the wisdom of committing this task to the consciences of judges." *Gertz*, 418 U.S. at 346, 94 S.Ct. at 3010. Perhaps in another context such a journey can be justified. *Cf. U.S. Healthcare*, 898 F.2d at 914 (Third Circuit refused to apply malice standard to statements made in a corporative advertising campaign).[38] Plaintiff's arguments are novel and well made, but the analysis ultimately fails. This Court finds existing precedent sufficient to protect Plaintiff's reputation and our nation's interest in free expression.

Accordingly, this Court holds that Plaintiff must evaluate Defendants' statement in both the publications and promotional materials against the malice standard. The statements in the promotional materials are not commercial, or even if so classified, the different treatment of them cannot be justified.

### F. The Malice Standard

■ Since Plaintiff is a limited purpose public figure and Plaintiff's arguments regarding commercial speech are rejected, National Life must demonstrate that Defendants acted with malice. Plaintiff must prove that the defendant made the statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times v. Sullivan*, 376 U.S. at 279–80, 84 S.Ct. at 726. Reckless disregard has in turn been defined as publishing with a "high degree of awareness of ... probable falsity." *Reuber v. Food Chemical News, Inc.*, 925 F.2d 703, 714 (4th Cir.1991) (citation omitted). Further, Plaintiff must establish malice not by a preponderance of the evidence, but by "clear and convincing evidence." *Reuber* 925 F.2d at 714.

National Life contends that Defendants wrote, published and republished the state-

---

**37.** Shakespeare, *Merchant of Venice.*

**38.** Of course, such arguments will have to deal with the difficulties of both defining commer-

cial speech and Supreme Court precedent. *Cf. Wolston*, 443 U.S. at 157, 99 S.Ct. at 2702; *Dun & Bradstreet*, 472 U.S. at 757, 105 S.Ct. at 2944.

ments with actual malice. As evidence of this malice National Life states that Defendant Band, the original author of the statements, did no research and had no particular expertise in the insurance industry. First, Plaintiff states that Band's approach in drawing a line between companies that received an "A +" rating such as National Life, and those that got a "AA" rating, or higher, was arbitrary and simplistic. According to National Life, Band knew that an A + rating meant a strong capacity to pay debts and meet expenses. Band knew that National Life had a very low percentage of its portfolio invested in junk bonds. In spite of this knowledge Band published his statements that National Life was one of the weakest insurance companies.

Second, Band did no research into National Life's particular financial situation before publishing what he thought the Standard and Poors rating meant. Third, none of the Defendants printed a retraction when confronted by the Plaintiff that the publication was in their view false.

In sum, Plaintiff writes, "Taken together, this evidence of knowing falsehood, deliberate slanting and thirst for profits constitute probative evidence of constitutional malice which must be examined and evaluated by the jury." Plaintiff is incorrect.

The Fourth Circuit has held that the following types of evidence, taken alone or together do not constitute actual malice: 1) evidence of defendants' debatable analysis of a document; 2) evidence of the defendants' failure to investigate; or even conscious decision not to inquire into the truth; 3) evidence of the defendants' profit motive. *See Reuber*, 925 F.2d at 715–18.

As such, the fact that Band did not investigate according to National Life's satisfaction is not enough.[39] *Id.* Neither is National Life's assertion that Band's method

is simplistic. *Id.* Band's reliance on one source, the S & P rating, does not constitute malice. *St. Amant v. Thompson*, 390 U.S. 727, 730, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968).[40]

Further, Band's desire to make a buck is irrelevant. "The cases from *New York Times v. Sullivan* onward teach that evidence of a defendant printing material to increase its profits does not suffice to prove actual malice." *Reuber*, 925 F.2d at 716.

The Court considered the malice standard and Plaintiff's status at this juncture, because both topics are appropriate questions of law for the Court's consideration. *Anderson*, 477 U.S. at 256–57, 106 S.Ct. at 2514–15 (plaintiff must demonstrate malice by clear and convincing evidence to survive summary judgment if plaintiff is a public figure); *Reuber*, 925 F.2d at 708 (determination of plaintiff's status as a public or private figure is a question of law). Some of the statements of which Plaintiff complains are probably not actionable, either because Defendants' statements are opinion, or are not of and concerning National Life. Out of the statements that remain, National Life cannot tickle malice out of this set of facts. As malice is the standard, Plaintiff's case fails, because it cannot demonstrate by clear and convincing evidence that Defendants acted with malice. *Anderson*, 477 U.S. at 256–57, 106 S.Ct. at 2514–15. Defendants' Motion for Summary Judgment is granted.

### III. *Conclusion*

The Court finds that Plaintiff, National Life, although not a general purpose public figure, is a limited purpose public figure. The Plaintiff has voluntarily injected itself into the vortex of a preexisting public controversy in order to influence its outcome.

---

**39.** There is no clear and convincing evidence here of obvious reasons that called Defendants' analysis, or investigation into question. *See Fitzgerald*, 691 F.2d at 670. "As long as the sources of the libelous information appeared reliable, and the defendant had no doubts about its accuracy, the courts have held the evidence of malice insufficient to support a jury verdict, even if a more thorough investigation might

have prevented the admitted error." *Id.* (citations omitted).

**40.** National Life's attempt to make Defendants' conduct meet the malice standard also fails, because Plaintiff is not singled out but is mentioned as part of a group, all of whom did not receive a favorable rating from S & P in Band's view. This analysis fails to show malice.

Plaintiff retained its public figure status during and after the alleged defamatory statements were made.

Further, the Court finds that Defendants' statements as contained in the promotional materials are not commercial speech, and even if they could be so characterized, there is no justification for any disparate treatment of them. Finally, given these conclusions, Plaintiff must evaluate Defendants' statements against a malice standard. After review of Defendants' conduct this Court finds, as a matter of law, that Plaintiff cannot sustain a case based on the malice standard. Summary Judgment is granted for the Defendants.

A separate Order shall issue.