Bruce B. HENRY, et al.

v.

NATIONAL ASSOCIATION OF AIR TRAFFIC SPECIALISTS, INC., et al.

Civ. No. L–92–1234.

United States District Court, D. Maryland.

Oct. 27, 1993.

Frank L. Kollman, Baltimore, MD, for plaintiffs.

Arthur L. Fox, II, Baltimore, MD, for defendants.

## MEMORANDUM

LEGG, District Judge.

This case essentially involves the libelousness of three letters published to all 1700 members of a union during a bitter dispute for control of the union.[1] Written by the union's Board of Directors ("the Board"), the challenged letters allegedly defamed the union's Executive Director and the Executive Vice President, the two plaintiffs herein. The Board wrote and published the letters shortly after the Board deposed the plaintiffs from their appointed positions. The plaintiffs also wrote and published letters explaining their version of the events surrounding this power struggle, but only the Board's letters are the subject of this libel suit.

The challenged statements resemble the hyperbole that typically arises in labor management disputes[2] and which the United States Supreme Court has repeatedly stated should enjoy protection from libel laws. The complaint in this case attempts to elevate this barrage of petty invectives to actionable libel. This Court concludes, however, that the disputed language is neither libelous nor motivated by malice.[3]

Pending before the Court is a Motion for Summary Judgment filed by the defendants National Association of Air Traffic Specialists, Inc, et al. The motion has been fully briefed and supplemental memoranda have been filed. Under Local Rule 105.6, the Court may decide this case solely on the papers and without a hearing. For the reasons stated below, the defendants' Motion for Summary Judgment will be GRANTED as to all counts of the Amended Complaint.

## I. FACTS

The National Association of Air Traffic Specialists, Inc. ("NAATS") is a union representing approximately 1700 air traffic specialists employed by the Federal Aviation Administration. The NAATS Board of Directors ("Board"), composed of seven NAATS Regional Coordinators and a Chairman, establishes all union policies and delegates its authority to elected union officials. NAATS elective offices include a President, an Executive Vice President, and several Regional Directors and Coordinators. Further, NAATS by-laws provide for the appointment of an Executive Director who conducts the day-to-day business of the union under the direction of the Board.

In October, 1984, the Board appointed the plaintiff Bruce B. Henry to serve as NAATS Executive Director. He was also simultaneously elected as President of the union. Seven years later, in October, 1991, the Board appointed the plaintiff Robin L. Covert to serve as NAATS Executive Vice President. In March 1992, the Board removed both men from their appointed positions. In the months following their removal, all 1700 NAATS members were subjected to a volley of open letters from both the Board and Henry about the events surrounding the plaintiffs' removal. Both plaintiffs and defendants sought to "set the record straight." Claiming, *inter alia*, that they were defamed by the letters, the plaintiffs then sued NAATS and the individual mem-

---

**1.** The Amended Complaint states five cause of action, including breach of contract and tortious interference with business relations. *See infra* note 4. These claims are ancillary to the libel claim.

**2.** Although the conflict between the plaintiffs and the defendants is not technically a labor management dispute, it involves the same pattern of vigorous debate that characterizes such disputes. Further, the contexts of the disputes are similar, for both involve public relations campaigns (often acrimonious) intended to sway union membership. *See infra* note 5.

**3.** The Court decides that the plaintiffs qualify as "public figures" because of their prominence as elected and appointed leaders of a 1700–member union. *See infra* note 6. Thus, under the malice standard announced in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), unless the plaintiffs show that the defendants uttered the challenged statements knowing that they were false or in reckless disregard of their truth or falsity, the plaintiffs cannot sue for libel. *See infra* section II(E)(2)(a).

bers of the Board in Maryland Circuit Court for Prince George's County. The case was removed to this Court on April 30, 1992. Plaintiffs seek $1 million in compensatory and punitive damages in their five-count Amended Complaint.[4]

On December 15, 1992, this Court dismissed several counts of the original complaint as to all named parties and all counts as to two defendants. The Court also granted plaintiffs' motion for leave to file an amended complaint. On June 9, 1993, this Court advised the parties that defendants' motion to dismiss, filed on September 1, 1992, would be converted into a motion for summary judgment pursuant to Federal Rule of Civil Procedure 12(b). In the same letter, the Court informed the parties that the plaintiffs had failed both to provide specific evidence of an employment contract and to identify the allegedly libelous statements and which parties made those statements. The Court also ordered the plaintiffs to produce sufficient evidence showing a genuine issue of fact as to all five counts in the Amended Complaint. Failure to provide such evidence, the Court asserted, would result in the granting of the defendants' motion for summary judgment. On June 30, 1993, the plaintiffs submitted a supplemental memorandum and affidavit, and the defendants responded on July 30, 1993.

## II. *DISCUSSION*

### A. *Standard for Summary Judgment*

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). That is, Rule 56 mandates the entry of summary judgment against a party who, after reasonable time for discovery and upon motion, "fails to make a showing sufficient to establish the existence of an element essential to

that party's case, and on which that party will bear the burden of proof at trial." *Id.* "[A] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial[,] [and] [t]he moving party is 'entitled to judgment as a matter of law.'" *Id.* at 323, 106 S.Ct. at 2552 (citations omitted).

The moving party bears the burden of demonstrating the absence of any genuine issue of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir.1979). In determining whether there is a genuine issue of material fact, the Court must view the facts, and all reasonable inferences to be drawn from them, in the light most favorable to the non-moving party. *Pulliam Inv. Co., v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir.1987); *Ross v. Communications Satellite Corp.*, 759 F.2d 355 (4th Cir.1985).

If the evidence favoring the non-moving plaintiff is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (citations omitted). Unsupported speculation is insufficient to defeat a motion for summary judgment. *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir.1987) (citing *Ash v. United Parcel Serv., Inc.*, 800 F.2d 409, 411–12 (4th Cir. 1986)). Moreover, the mere existence of some factual dispute is insufficient to defeat a motion for summary judgment; there must be a genuine issue of material fact. *Anderson*, 477 U.S. at 247–48, 106 S.Ct. at 2509–10.

Material factual disputes are "genuine" only if a reasonable jury could return a verdict for the non-moving party based upon the record as a whole. *Id.* at 248–49, 106 S.Ct. at 2510–11. "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could

---

4. The five claims are: Wrongful Discharge of Employee; Breach of Contract; Intentional Interference with Contractual Relations; Wrongful Interference with Economic Relationships or Prospective Advantage; and Libel.

reasonably find for the [non-moving party]." *Id.* at 252, 106 S.Ct. at 2512.

With these principles in mind, the Court will address the arguments presented by the parties.

### B. *Count I: Wrongful Discharge of Employee*

In Count I of the Amended Complaint, plaintiff Henry asserts that, under the terms of his employment with NAATS, he was entitled to notice and a hearing prior to termination. Amended Complaint ¶ 37. In addition, he asserts that he was not to be terminated "except for just cause." *Id.*

Under Maryland law, an employment contract of infinite duration is an "at will" contract and may be terminated by either party at any time. *See Adler v. American Standard Corp.*, 291 Md. 31, 432 A.2d 464, 467 (1981); *Page v. Carolina Coach Co.*, 667 F.2d 1156, 1158 (4th Cir.1982); *Ferragamo v. Signet Bank/Maryland*, No. WN–88–3333, 1992 WL 219826, at *4 (D.Md. March 17, 1992). The Maryland Court of Appeals recognized an exception to this rule in *Dahl v. Brunswick Corp.*, 277 Md. 471, 356 A.2d 221 (1976). The *Dahl* Court stated that "employer policy directives regarding aspects of the employment relationship become contractual obligations when, with knowledge of their existence, employees start or continue to work for the employer." *Dahl*, 356 A.2d at 224.

The Maryland Court of Appeals expanded the *Dahl* exception in *Staggs v. Blue Cross of Md., Inc.*, 61 Md.App. 381, 486 A.2d 798 (Md.Ct.Spec.App.), *cert. denied*, 303 Md. 295, 493 A.2d 349 (1985):

> [W]e hold that provisions in such policy statements that limit the employer's discretion to terminate an indefinite employment or that set forth a required procedure for termination of such employment may, if properly expressed and communicated to the employee, become contractual undertakings by the employer that are enforceable by the employee. In so holding, we caution that not every statement made in a personnel handbook or other publication will rise to the level of an enforceable contract.... "[G]eneral statements of policy are no more than that and do not

meet the contractual requirements for offer."

*Staggs*, 486 A.2d at 803–04 (quoting *Pine River Bank v. Mettille*, 333 N.W.2d 622, 626 (Minn.1983)).

In this case, Henry alleges the existence of policy statements that constrain the Board's ability to terminate his position as NAATS Executive Director. These constraints allegedly may be found in NAATS by-laws, minutes of Board meetings, and express promises by Board members. *See also* Affidavit of Bruce B. Henry, Plaintiffs' Memorandum in Opposition to Motion to Dismiss; Plaintiffs' Supplemental Memorandum. After reviewing the proffered evidence, the Court concludes that neither the Board nor Henry ever created—or intended to create—"for cause" termination procedures.

In 1984, the Board amended the NAATS by-laws and removed the sentence providing that "[t]he Executive Director may be removed from office by appropriate action of the Board of Directors." Henry argues that such an alteration shows that the Board abdicated its power to terminate the appointment of the Executive Director. Henry Affidavit ¶ 7, Plaintiffs' Supplemental Memorandum. In both their scope and specificity, however, the amended by-laws indicate otherwise. Amended Section 10 of the by-laws demonstrates the Board's intention to retain complete control over the actions of the Executive Director. Subsections 1 and 1(a) of Section 10, for example, state that the Board shall hire the Executive Director and that the Executive Director "shall ... [c]onduct the day-to-day business of the [NAATS] *under the direction of the Board of Directors.*" Exhibit 1, Defendants' Motion to Dismiss (emphasis added). The remainder of Section 10 specifies in detail the Executive Director's salary level, allowable expenses, and annual leave. Nothing in the language of amended Section 10 supports Henry's assertion that the Board relinquished control over the termination of the Executive Director.

None of the other sections of the amended by-laws supports Henry's assertions either. Section 14 states that the Board has the authority to establish all NAATS policy and

to delegate its power to any NAATS officers. Section 20 states that the Board may authorize committees and that the Executive Director's appointment of a committee chairperson is subject to Board approval. The by-laws also give the Board authority to schedule all national conventions, propose dues, amend by-laws, and authorize additional regional or local representatives. After reviewing all amended NAATS by-laws, the Court concludes that the Board maintained plenary power over the Executive Director as an at-will employee of the Board. ·

Henry also claims that minutes of Board meetings and express promises by Board members indicate that he could not be terminated without just cause. Although Henry has had numerous opportunities to inspect NAATS books and records to provide the Court with such evidence, *see* Letter from Arthur L. Fox, II to Frank L. Kollman (dated April 9, 1993), he has proffered no evidence of any such minutes or promises save his own bare allegations. *See* Henry Affidavit ¶ 10.

The defendants, however, have supplied the Court with copies of minutes of several Board meetings, including the October, 1984 meeting during which Bruce B. Henry was hired as NAATS Executive Director. *See* Defendants' Second Supplemental Reply Memorandum. These minutes confirm that no contract existed between Henry and either the Board or NAATS. Henry himself stated, at the hiring meeting, that he "had *no intention* of asking for a contract." Exhibit E, Defendants' Second Supplemental Reply Memorandum (emphasis added). Another Board member replied that "[t]he Executive Director is going to be the Executive Director *until the Board says he is not* !" *Id.* (emphasis added).

In another Board meeting in January 1989 in Houston, Texas, Henry characterized the position of the Executive Director as "appointed." Exhibit F, Supplemental Affidavit of Gary D. Simms. At that meeting, he also stated:

> [M]y feeling is that *the power of the Board is to hire and fire the Executive Director. You could fire me as Executive Director,* and I would have no choice but to go back

to Dayton as a journeyman as [sic] President.

*Id.* (emphasis added). Thus, five years after he was hired as Executive Director, Henry acknowledged that he was an at-will employee and that the Board maintained plenary power over his termination.

The only "procedure" required for terminating Henry's position as Executive Director was a simple majority vote of the Board. *Id.; see also* Exhibit 1, Defendants' Motion to Dismiss (section 10(1)(a)). The Court therefore concludes that the NAATS Board legitimately removed Bruce B. Henry as Executive Director of NAATS. *See* Exhibit 3, Defendants' Motion to Dismiss. Nothing produced by Henry suggests otherwise.

Accordingly, the defendants' Motion for Summary Judgment as to Count I is GRANTED.

### C. Count II: Breach of Contract

In Count II of the Amended Complaint, the plaintiffs assert that NAATS breached a valid employment contract with Henry. Amended Complaint ¶¶ 42, 47. The evidence discussed above shows that, at the time Henry was hired, there was no such contract and that he had no intention of asking for one. The proffered NAATS by-laws and minutes of Board meetings indicate that neither Henry nor the Board ever created or intended to create an employment contract with him. The Court, therefore, concluded, *supra*, that no employment contract existed between Henry and NAATS. Accordingly, the defendants' Motion for Summary Judgment as to Count II is GRANTED.

### D. Counts III & IV: Intentional Interference with Contractual Relations; Wrongful Interference with Business Relations

In Counts III and IV of the Amended Complaint, the plaintiffs assert Intentional Interference with Contractual Relations, and Wrongful Interference with Economic Relationships or Prospective Advantage, respectively. *See* Amended Complaint.

As to Count III, Henry alleges that he had a "valid employment contract" with NAATS. *Id.* at ¶ 47. The individually named members of the Board allegedly interfered with this contract. As already discussed, Henry has submitted no evidence that such a contract existed. Accordingly, as to Count III, the defendants' Motion for Summary Judgment is GRANTED.

■ As to Count IV, the plaintiffs allege that Henry had a valid business relationship with NAATS and that the individually-named Board members intentionally and maliciously interfered with that relationship. *Id.*

■ ▪Under Maryland law, any tort involving prospective contracts has four elements:

(1) Intentional and willful acts;

(2) Calculated to cause damage to the plaintiffs in their lawful business;

(3) Done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and

(4) Actual damage and loss resulting.

*K & K Management, Inc. v. Lee,* 316 Md. 137, 155, 557 A.2d 965 (1989) (citing *Natural Design, Inc. v. Rouse Co.,* 302 Md. 47, 69, 485 A.2d 663 (1984)). A plaintiff must produce sufficient evidence of all four elements to withstand summary judgment.

As previously discussed, however, Henry has failed to produce sufficient evidence that the Board was "without right or justifiable cause" to terminate him. The by-laws and meeting minutes reveal that both the Board and Henry himself fully understood that the Executive Director could be removed by the Board through simple majority vote. This Court has already concluded, *supra,* that the NAATS Board legitimately removed Bruce B. Henry from his position as Executive Director. Thus, Count IV fails as a matter of law.

■ Furthermore, Count IV also fails because, as the *K & K Management* Court held, tortious interference with business relations requires three parties—the two parties to the contract and a third party who is the "interferer." *Id.,* 316 Md. at 154, 557 A.2d

965. Even if the alleged employment contract existed, the two parties to that contract would be the Board and Henry. Yet Henry alleges that the Board, in addition to being a party to the contract, was also the interferer. The Maryland rule, as articulated in *K & K Management,* is that "there is no cause of action for interference with a contract *when suit is brought against a party to the contract."* *Id.* at 156, 557 A.2d 965 (citations omitted) (emphasis added). The Maryland rule appears to be basic black-letter law. *See* W. Page Keeton *et al., Prosser and Keeton on The Law of Torts* 990 (5th ed. 1984) ("The defendant's breach of his own contract with the plaintiff is of course not a basis for the tort."). Therefore, Henry cannot sue the defendants for the breach of an employment contract in an action for Wrongful Interference with Economic Advantage. Accordingly, the defendants' Motion for Summary Judgment as to Count IV is GRANTED.

### E. *Count V: Libel*

#### 1. *General Principles of Law*

■ In Count V of the Amended Complaint, the plaintiffs assert that the defendants "published false and defamatory statements about plaintiffs." Amended Complaint ¶ 56. To establish a prima facie case of libel under Maryland law, a plaintiff must show: "(1) that defendants published statements of or concerning plaintiff to a third party; (2) that the statements were false and defamatory; (3) that the statements were published with the degree of fault required by the constitution; [and] (4) that the statements resulted in harm to the plaintiff." *National Life Ins. Co. v. Phillips Publishing, Inc.,* 793 F.Supp. 627, 631 (D.Md.1992) (citations and emphasis omitted). If the plaintiff in a defamation suit is a public figure, the plaintiff must show actual malice on the part of the publisher. *Id.; see also New York Times Co. v. Sullivan,* 376 U.S. 254, 288–91, 84 S.Ct. 710, 730–32, 11 L.Ed.2d 686 (1964); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Whether the plaintiff is a public figure is question of law for the Court to determine. *See Reuber v. Food Chemical News, Inc.,* 925 F.2d 703, 708

(4th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 2814, 115 L.Ed.2d 986 (1991).

In the context of a labor management dispute,[5] however, the United States Supreme Court has stated that, regardless of the "public figure" status of the complainant,[6] the malice standard applies. *Linn v. United Plant Guard Workers, Local 114,* 383 U.S. 53, 64–65, 86 S.Ct. 657, 664, 15 L.Ed.2d 582 (1966) ("We therefore limit the availability of state remedies for libel to those instances in which the complainant can show that the defamatory statements were circulated with malice and caused him damage."). Thus, the plaintiffs in the instant case must show that the defendants' statements, if libelous, were "published with knowledge of their falsity or with reckless disregard of whether they were true or false." *Id.* at 65, 86 S.Ct. at 664.

Because the question of actual malice involves subjective evaluations, the Court is reluctant to take the malice determination from a jury. *National Life Ins. Co.,* 793 F.Supp. at 632; *cf. Herold v. Hajoca Corp.,* 864 F.2d 317, 319 (4th Cir.1988) (cautioning against motion for summary judgment, as a matter of law, in age discrimination case

---

5. Although this dispute is technically not a labor management dispute, it resembles one. In a labor management dispute, the issue is whether union membership will vote in or out a union. In order to persuade employees to their side, both labor and management mount vigorous public relations campaigns that are often characterized by charges and counter-charges.

The situation in this case closely resembles that type of dispute because both the union's Board of Directors and the removed officers were vying for the good opinion (and votes) of union membership. This campaign was just as vigorous (and vituperative) as that in a labor management dispute. At stake in this bitter power struggle was control of the union itself.

6. Given their prominence as elected and appointed leaders of a 1700-member union, the two plaintiffs classify as "public figures." As the letters at issue indicate, the plaintiffs have represented themselves to both union membership and the FAA as the duly elected and duly appointed leaders of the NAATS. The plaintiffs had access to channels of effective communication; they assumed the positions of prominence by attempting to influence union membership; the power struggle existed prior to the publication of the challenged letters; and, finally, the plaintiffs retained their public figure status throughout the volley of allegedly defamatory letters. *See Reuber,* 925 F.2d at 708–10. Thus, the malice standard

---

because motive and causation are at issue), *cert. denied,* 490 U.S. 1107, 109 S.Ct. 3159, 104 L.Ed.2d 1022 (1989). Nevertheless, if the plaintiffs in this case cannot produce "clear and convincing evidence" of actual malice—as well as of the other prima facie elements of the libel claim—this Court will grant defendants' summary judgment motion. *New York Times,* 376 U.S. at 254, 84 S.Ct. at 710; *Anderson,* 477 U.S. at 256–57, 106 S.Ct. at 2514–15.

### 2. Analysis

The plaintiffs assert that, "[b]y various letters, memoranda, and other communications, defendants ... have published libelous statements concerning plaintiffs." Amended Complaint ¶ 15. Specifically, the plaintiffs charge that the defendants falsely stated that the plaintiffs were corrupt, incompetent, and mismanaged and embezzled funds. *Id.* ¶¶ 15(a)–(f), 56–63. In support of these contentions and in response to the Court's order, the plaintiffs proffer three memoranda allegedly libelous.[7] *See* Exhibits C, D, and E, Plaintiffs' Supplemental Memorandum.

---

would apply in any event. Further, the plaintiffs in the instant case even acknowledge that the malice standard applies. *See* Plaintiffs' Memorandum in Opposition to Motion to Dismiss, pp. 7–8.

7. Exhibit C is signed by ten members of the NAATS Board of Directors. Of the ten signatories, five are named defendants (Huffman, Maisel, Boberick, Campbell, and Pike). Exhibit D is unsigned, but the plaintiffs contend the NAATS Board is responsible for the circulation of the two-page document. *See* Affidavit of Bruce B. Henry ¶ 14, Plaintiffs' Supplemental Memorandum. Finally, Exhibit E is signed by Albert C. Osborn, who is not a named defendant; the Court will consider this exhibit anyway. *See infra* note 13.

According to the plaintiffs, the defendants "falsely stated, explicitly and implicitly, that:"
 a. Plaintiffs Henry and Covert were corrupt;
 b. Plaintiffs were incompetent and intentionally mismanaged the affairs of defendant NAATS;
 c. Plaintiffs misappropriated funds of defendant NAATS for personal use and expenses;
 d. Plaintiffs established a slush fund to finance personal expenses;
 e. Plaintiffs embezzled funds of defendant NAATS; and
 f. Plaintiffs were not performing their jobs or duties in a satisfactory manner.

The Court's analysis of this evidence divides into two basic inquiries: first, have the plaintiffs shown that the defendants uttered the seven challenged statements in the three exhibits with actual malice?; second, even if uttered with actual malice, do the disputed statements constitute protected opinion? The Court shall analyze the question of actual malice in a single subsection (section II(E)(2)(a)). The Court's second inquiry tracks the Fourth Circuit's four-part test for libel and is thus divided into four subsections (sections II(E)(2)(b)(i)–(iv)).

Having examined all this evidence, the Court finds that the plaintiffs have failed to produce clear and convincing evidence of the defendants' actual malice. Furthermore, the Court concludes that the allegedly libelous statements constitute protected opinion and therefore cannot form the basis of a libel suit. Accordingly, the defendants' Motion for Summary Judgment as to Count V is GRANTED.

a. *Actual Malice*

▌ The plaintiffs in this case must produce clear and convincing evidence that the defendants uttered the challenged statements with actual malice. The Supreme Court explicated the actual malice standard in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The plaintiffs must prove that the defendants made each statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279–80, 84 S.Ct. at 726. The Fourth Circuit has defined "reckless disregard" as a "high degree of awareness of probable falsity." *Reuber*, 925 F.2d at 714 (citation omitted); *see also National Life*, 793 F.Supp. at 648. The plaintiffs must establish actual malice by "clear and convincing evidence." *Reuber*, 925 F.2d at 714; *National Life*, 793 F.Supp. at 648.

The plaintiffs have submitted three letters in support of their contention that the defendants acted "willfully, maliciously, and with reckless indifference to the truth, with an

intention to harm the plaintiffs." Amended Complaint ¶ 60. The Court will briefly review these three exhibits, which contain a total of seven challenged statements. First, Exhibit C, which is signed by all NAATS Regional Directors, allegedly "suggest[s] and indicate[s] that [Henry] misappropriated money from [NAATS] for [his] personal use. *Id.* ¶ 13. Second, Exhibit D allegedly contains false statements of fact and "suggest[s] that [Henry] [has] engaged in criminal activity." *Id.* ¶ 14. These statements concern Henry's billing and record-keeping practices, and possession of a computer and video tapes. *Id.* Finally, in Exhibit E, the NAATS Board allegedly "states that [the plaintiffs] [were] 'corrupt.'" *Id.* ¶ 15. The Court concludes that these statements do not demonstrate clear and convincing evidence of actual malice.

First, as to Exhibit C, the plaintiffs direct the Court to two statements allegedly uttered with actual malice. In one sentence, *see infra* section II(E)(2)(b)(ii), the author writes that Henry was reimbursed for $33,-724 in personal expenses. In another sentence, *id.*, the author writes that Henry will not be paid 25 cents a mile for his motorcycle trips; instead, he will be paid the "current government rate." Nothing in these statements indicates malice. Indeed, Henry never asserts that these are actually false statements and that the defendants were aware of this falsity. That is, Henry never argues that he did *not* spend $33,724 in personal expenses or that he did *not* file for reimbursement at the 25 cents per mile rate. Because Henry apparently cannot show knowledge of falsity, he resorts to the bare allegation that these two statements maliciously intimate that he "misappropriated" money from the NAATS for personal use. There is nothing malicious in informing NAATS members about factually correct expenditures of the Executive Director, especially when the disputed letter was written in response to Henry's earlier letter which charged the Board with leaving NAATS in a "precarious" financial position. Exhibit 17,

Amended Complaint ¶ 15(a)–(f). These statements purportedly caused the plaintiffs "public humiliation, mental anguish, loss of the substan-

tial hospitality of friends, and the sneer and sarcasm of NAATS members who believe the false statements." *Id.* ¶ 58.

Defendants' Motion to Dismiss. In this acrimonious and vituperative colloquy between the Board and Henry, the writers of Exhibit C have no more acted with actual malice than has Henry, and "[u]nsupported allegations as to motive do not confer talismanic immunity from Rule 56." *De Leon v. Saint Joseph Hosp., Inc.*, 871 F.2d 1229, 1236 (4th Cir.) (citation omitted), *cert. denied*, 493 U.S. 825, 110 S.Ct. 87, 107 L.Ed.2d 52 (1989).

The second piece of proffered evidence, Exhibit D, is allegedly a memorandum circulated by the Board.[8] The plaintiffs direct the Court to four statements in that memorandum:

Why would Bruce Henry:

\* \* \* \* \* \*

\* bill NAATS for cross-country motorcycle trips and not charge the time against annual leave?

\* \* \* \* \* \*

\* not keep records of leave usage?

\* \* \* \* \* \*

\* remove personal computer from NAATS headquarters and refuse to return it?

\* remove video tapes and still pictures from of [sic] NAATS meetings from NAATS headquarters?

Exhibit D, Plaintiffs' Supplemental Memorandum. According to the plaintiffs, these statements are false and suggest criminal activity. Henry Affidavit ¶ 14, Plaintiffs' Supplemental Memorandum. The Court must now analyze these statements.

Henry challenges the veracity of the first statement in Exhibit D—that he billed the NAATS for cross-country motorcycle trips. Henry must show that this statement is false and that the defendants knew it was false or uttered it in reckless disregard of its falsity. Ironically, Henry himself admitted that he billed the NAATS for at least one of his cross-country motorcycle trips. Exhibit 24, Defendants' Motion to Dismiss ("All I charged the union was the equivalent of what a one-way coach ticket would have cost."). Thus, there appears to be some basis for the

defendants' belief that the union was billed for at least one of these trips.

Henry also asserts that the second statement in Exhibit D—that he did not keep records of leave usage—is false. Henry Affidavit ¶ 14. The affidavits, however, belie any showing of actual malice. In an open letter to all NAATS members written approximately one month after the plaintiffs were removed, Henry stated that "NAATS also owes me a payment for my accumulated annual leave but the [Board] [is] claiming that they can't find the records even though I saw them sitting on my old desk when I went in to pick up my things after the massacre." Exhibit 17, Defendants' Motion to Dismiss. In reply to this letter, the Board issued its own open letter to NAATS members and addressed the annual leave issue.

Mr. Henry is claiming to have an annual leave balance of 608 hours while the By-laws say he can't accumulate any more than 240. Our President says he saw the records for his annual leave balance sitting on his old desk in the office. We assume he's talking about the wall calendar that he used to scribble things on. We cannot find any other record[;] apparently he put himself on the honor system of accounting.

Exhibit 27, Defendants' Motion to Dismiss.

Henry has proffered no evidence about these disputed annual leave records. The Board acknowledged finding a wall calendar in his old office but stated that the calendar did not constitute annual leave records. Exhibit 27, Defendants' Motion to Dismiss. Henry has failed to assert that the wall calendar did in fact constitute the disputed records. Further, he has not specified what the records looked like or what they contained. Finally, Henry has offered no facts showing knowledge of falsity. That is, he has neither alleged nor demonstrated that the Board *did* find the annual leave records but lied about that discovery.

Henry interprets the last two statements in Exhibit D as intimating that he "stole" a computer, video tapes, and still pictures. *See* Henry Affidavit ¶ 20. The actual letter, however, states that he "removed" those items.

---

8. In construing the facts in the light most favorable to the movants, the Court assumes that the

Board did author this exhibit even though authorship has not been conclusively established.

If removal did in fact occur, actual malice cannot be established. Henry does not say, however, that he did not *remove* the aforementioned items; rather, he states that he did not *steal* such items. The difference between "steal" and "remove" is not insignificant; the former is a criminal act but the latter is not. Courts have consistently held that the knowing publication of false criminal activity or charges constitutes malice sufficient to establish libel. *See Batson v. Shiflett*, 325 Md. 684, 602 A.2d 1191 (1992). The Court concludes that Henry does not challenge the truth of the statements that he "removed" certain items from NAATS headquarters. Heeding the admonitions of the Fourth Circuit,[9] the Court declines to interpret "to remove" as "to steal."

Finally, Exhibit E contains a statement which the plaintiffs allege is defamatory: "Lord Action, of the British Parliament two hundred years ago said, 'Power corrupts, and absolute power corrupts absolutely!' Perhaps that is what happened to Bruce." The plaintiffs assert that this quotation imputes criminal behavior to them. Later in this Memorandum, *see infra* section II(E)(2)(b)(i), the Court concludes that this blatantly histrionic use of a well-known and oft-used quotation about the influence of power constitutes protected opinion. Because the statement is not an "objectively verifiable event," *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 22, 110 S.Ct. 2695, 2707, 111 L.Ed.2d 1 (1990), the defendants could not have uttered it with knowledge of its falsity or in reckless disregard of its truth or falsity. Thus, the Court finds that Exhibit E is not actionable.

In sum, the Court concludes that none of the seven statements in Exhibits C, D, and E constitutes actual malice. The plaintiffs have failed to offer sufficient evidence to the contrary. Nevertheless, the Court shall now determine whether the challenged state-

ments could even be characterized as libelous.

### b. *Protected Opinion*

 Even if the plaintiffs could establish that the seven challenged statements in the three exhibits were uttered with actual malice, they must produce sufficient evidence that they constitute libel. The Court concludes that all statements in the exhibits qualify as protected opinion under the Fourth Circuit's most recent formulation of the libel inquiry.

Generally, while facts are actionable as libel, opinions are not. *Potomac Valve & Fitting Inc. v. Crawford · Fitting Co.*, 829 F.2d 1280, 1286 (4th Cir.1987). In *Potomac Valve*, the Fourth Circuit adopted the distinction between fact and opinion as first articulated by the Supreme Court in *Gertz v. Robert Welch, Inc.*:

> Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correctness not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact.

418 U.S. 323, 339–40, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974).[10] Recently, the Supreme Court appeared to retreat from this notion. In *Milkovich v. Lorain Journal Co.*, the Supreme Court asserted that there is no "wholesale defamation exception for anything that might be labeled 'opinion.'" 497 U.S. 1, 18, 110 S.Ct. 2695, 2705, 111 L.Ed.2d 1 (1990). The *Milkovich* Court stated, however, that if a statement is not provable as false or is not reasonably interpretable as stating facts, then it cannot form the basis of a libel suit. *Id.* at 19–20, 110 S.Ct. at 2706–07. Under *Milkovich*, only an "objectively verifiable event is actionable." *Id.* at 22, 110 S.Ct. at 2707 (citations omitted). Thus, although

---

9. The Fourth Circuit has cautioned against the "interpretation" of allegedly libelous statements. *See Potomac Valve & Fitting Inc. v. Crawford Fitting Co.*, 829 F.2d 1280, 1287 n. 22 (4th Cir. 1987) ("We regard [such interpretation] as a dangerous enterprise.").

10. Although this oft-quoted statement from *Gertz* is technically dicta, "a majority of federal circuit

courts … have accepted the statement as controlling law." *Ollman v. Evans*, 750 F.2d 970, 964 n. 6 (D.C.Cir.1984), *cert. denied*, 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985). Thus, the constitutional distinction between fact and opinion is "firmly established" in the case law of the federal circuit courts. *Potomac Valve*, 829 F.2d at 1286.

opinions are not absolutely privileged, the basic distinction between fact and opinion appears to have survived *Milkovich.* Accordingly, this Court begins with a discussion of the fact/opinion distinction.

In *Ollman v. Evans,* the D.C. Circuit proposed a four-factor analysis in identifying an opinion. 750 F.2d 970, 979–84 (1984). Under *Ollman,* a trial judge should: (1) consider the author's choice of words; (2) decide whether the statement is capable of objective characterization as either true or false; (3) examine the specific context of the statement within the writing as a whole; and (4) consider the broader social context in which the statement appears. *Id.*

The Fourth Circuit has adopted the *Ollman* factors with some modification. *Potomac Valve,* 829 F.2d at 1288. In *Potomac Valve,* the Court of Appeals articulated a two-part test involving a consideration of the four *Ollman* factors to determine whether a defamatory statement is opinion or fact. *Id.* The threshold inquiry is whether the challenged statement can be objectively characterized as true or false. *Id.; see also Blue Ridge Bank v. Veribanc, Inc.,* 866 F.2d 681, 685 (4th Cir.1989). If the statement cannot be so characterized, it is not actionable. *Potomac Valve,* 829 F.2d at 1288. If the statement can be characterized as either true or false, the three remaining *Ollman* factors [11] must be considered. *Veribanc,* 866 F.2d at 685 (citation omitted). As the Fourth Circuit asserted in *Potomac Valve,* "[e]ven when a statement is subject to verification, ... it may still be protected if it can best be understood from its language and context to represent the personal view of the author or speaker who made it." 829 F.2d at 1288. Thus, if a verifiable statement satisfies any one of the remaining three *Ollman* factors discussed above such that a reasonable per-

son would recognize its "weakly substantiated or subjective character," *id.,* then the statement qualifies as protected opinion.

i) *Objective Characterization of the Statements*

Initially, the Court must decide whether the allegedly defamatory letters (Exhibits C, D, and E) satisfy the *Potomac Valve* threshold requirement of objective characterization as either true or false. In deciding whether the statements in question meet this threshold, the Court will first consider the statement involving corruption in Exhibit E and then analyze the six remaining statements in Exhibits C and D.

The plaintiffs assert that the defendants called them "corrupt" in Exhibit E. Amended Complaint ¶ 15(a). The reference to corruption appears in two letters to all NAATS members—one from Albert C. Osborn (Exhibit E, Plaintiffs' Supplemental Memorandum) and another from Paul S. Huffman (Exhibit 26, Defendants' Motion to Dismiss). Interestingly, both letters contain nearly verbatim sentences about corruption. Osborn's statement reads: "Lord Acton, of the British Parliament two hundred years ago said, 'Power corrupts, and absolute power corrupts absolutely!' Perhaps that is what happened to Bruce." And Huffman's statement reads: "There is a saying from the British Parliament that is over two hundred years old which states: 'Power corrupts, and absolute power corrupts absolutely," [sic] perhaps that is what happened to both Robin and Bruce." Further, both letters contain several virtually identical passages, suggesting that Osborn used Huffman's letter as a model.[12] Or, at the very least, both men appear to have consulted each other about the form, content, and wording of their letters.[13]

---

11. These factors are: the author's choice of words; the context of the challenged statement within the writing as a whole; and the broader social context that informs the statement. *Veribanc,* 866 F.2d at 685.

12. Huffman's letter is dated one day earlier than Osborn's.

13. The defendants argue that the Court should not consider the Osborn letter in deciding the libel issue, since Osborn is not a named defen-

dant. Defendants' Second Supplemental Reply Memorandum in Support of Motion to Dismiss, pp. 6–7. Although Osborn is not a named defendant, Huffman is. Because of the similarity between the two letters, the Court shall treat the Osborn and Huffman letters as a single letter. And, considering this evidence in the light most favorable to the non-moving party, the Court shall construe the Osborn–Huffman letter as having been written by either Huffman himself or by the NAATS Board. Thus, the Court will proceed

As the defendants correctly argue, the Osborn–Huffman letter does not expressly state that the plaintiffs are corrupt. Nor does the statement intimate that the plaintiffs have taken bribes or sold favors. Plaintiffs' Motion in Opposition to Motion to Dismiss, p. 7 n. 4. At best, the statement merely suggests that the plaintiffs have been corrupted by their positions within the NAATS. Nothing in the entire letter· suggests that the plaintiffs have engaged in criminal activity. Lord Acton was not referring to power's tendency to ˙make a person corrupt in the sense of illegal acts. Rather, he was speaking primarily of power's tendency to make a person arbitrary, aloof, and indifferent to the effects of his actions on others. Further, of the eleven entries listed in the definition of the verb "to corrupt," only one even suggests an illegal act.[14] The challenged statement in this case is merely the writer's rather histrionically expressed opinion about a perceived change in the plaintiffs' personalities.

The plaintiffs correctly argue that statements suggesting that a person has engaged in criminal activity are considered libelous. Such·statements are verifiable as either true or false. *See, e.g., Batson,* 325 Md. at 694–95, 602 A.2d 1191 (defendant stated that plaintiff had committed "crimes of conspiracy, perjury, falsification of records, [and] illegal contract ratification"). Similarly, the Fourth Circuit has held that the publication of factually incorrect numbers in a financial report constituted actionable libel. *Veribanc,* 866 F.2d at 685.

"[L]oose, figurative, or hyperbolic language," on the other hand, cannot form the basis of a libel suit because it is not objectively verifiable. *Milkovich,* 497 U.S. at 21, 110 S.Ct. at 2707. For example, in *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin,* 418 U.S. 264, 268, 94 S.Ct. 2770, 2773, 41 L.Ed.2d 745 (1974), a union newsletter described the plaintiffs as

·"scabs." Relying on *Gertz,* the Supreme Court held that "scab" was an opinion because "such exaggerated rhetoric [is] commonplace in· labor disputes." *Id.* at 286, 94 S.Ct. at 2782. Further, in *Greenbelt Coop. Publishing Ass'n v. Bressler,* 398 U.S. 6, 14, 90 S.Ct. 1537, 1542, 26 L.Ed.2d 6 (1970), the Supreme Court concluded that the use of the word "blackmail" to characterize a developer's negotiating position with city council was "no more than rhetorical hyperbole, a vigorous epithet used by those who considered [the developer's] negotiating position extremely unreasonable."

Further, the Fourth Circuit has held as opinion the statement that the plaintiff "did not spend a reasonable percentage of total income on program services." *National Found. for Cancer Research, Inc. v. Council of Better Business Bureaus, Inc.,* 705 F.2d 98, 101 (4th Cir.), *cert. denied,* 464 U.S. 830, 104 S.Ct. 108, 78 L.Ed.2d 110 (1983). In a another case, the Fourth Circuit held as not actionable a competitor's statement that the plaintiff's results were based on "a (purposely) very poor test· designed to snow the customer." *Potomac Valve,* 829 F.2d at 1283. More recently, in *Polanco v. Fager,* 886 F.2d 66, 69 (4th Cir.1989), the Fourth Circuit held that, under Maryland libel law, the statement that a doctor performed an operation for greed was protected opinion and therefore not actionable.[15]

Similar to these examples, the use in this case of a well-known and ubiquitous quotation about power's corrupting influence is simply "incapable of positive proof." *Potomac Valve,* 829 F.2d at 1289. This is not a case in which false statements about corruption contain "strong undertones of illegality" and connote "illegal and unethical actions." *Rinaldi v. Holt, Rinehart & Winston, Inc.,* 42 N.Y.2d 369, 397 N.Y.S.2d 943, 949, 951, 366 N.E.2d 1299, 1305, 1307, *cert. denied,* 434 U.S. 969, 98 S.Ct. 514, 54 L.Ed.2d 456 (1977).

---

with its analysis of the allegedly libelous statements about corruption.

**14.** The word "bribe" is listed. *Webster's Third New International Dictionary* 512 (1976).

**15.** In *Haigh v. Matsushita Elec. Corp. of America,* 676 F.Supp. 1332, 1339 (E.D.Va.1987), the court

held as actionable a statement that appears to be a clear example of opinion: "Luskin[']s would not give him [the plaintiff] the time of day." The court in *Haigh,* however, was deciding a motion to dismiss and noted that, on motion for summary judgment, affidavits might show that the statement was protected opinion. *Id.*

This Court concludes that the statement about the corrupting influence of power was "loose, figurative, or hyperbolic language" that any reasonable reader would discount. *Milkovich,* 497 U.S. at 21, 110 S.Ct. at 2707. The plaintiffs have failed to produce clear and convincing evidence to the contrary. Because the statement about corruption in Exhibit E is not capable of objective characterization as either true or false, the Court holds that the statement is not actionable as libel; therefore, the Court need not examine this statement under the remaining three *Ollman* factors.[16]

Regarding the six challenged statements in Exhibits C and D, however, all can be objectively characterized as either true or false. Either Henry misappropriated NAATS monies or he did not. Either he established a slush fund or he did not. "The truth or falsity of [these] statement[s] does not depend upon subjective values or indefinite terms." *Potomac Valve,* 829 F.2d at 1280. Thus, the Court finds that, unlike the statement about corruption in Exhibit E, all six statements in Exhibits C and D are characterizable as either true or false, thus satisfying the *Potomac Valve* threshold question.

ii) *The First* Ollman *Prong: Language of the Statements*

Having concluded that the six allegedly defamatory statements in Exhibits C and D do not qualify as protected opinion under first prong of the two-part *Potomac Valve* test, the Court must now analyze the six statements under the second prong of the *Potomac Valve* test. The second prong contains the three remaining *Ollman* factors: (1) the language of the statements, (2) the situation of the statements within the specific context of the entire document, and (3) the situation of the statements within their broader social context. Under *Potomac Valve,* the statements can still qualify as protected opinion if any one of the these three criteria is satisfied.

Exhibit C is signed by ten NAATS regional directors and coordinators; of these ten, five are named defendants (Pike, Huffman, Campbell, Maisel, and Boberick). Henry contends that statements from this letter "suggest that [Henry] misappropriated money from Defendant for [his] personal use." Henry Affidavit ¶ 13(a)–(b), Plaintiffs' Supplemental Memorandum. In particular, Henry focuses on two statements in this letter. The first statement is underlined and reproduced below together with the entire paragraph in which it appears:

> President Henry talks about the "precarious position" the union is now in financially, but earlier in his letter [17] he gives the impression that he wasn't allowed access to these records. Actually the union is in far better shape now, both financially and professionally. We no longer pay him $75,775 a year *with an additional $33,724 in personal expenses.* That amounts to $92 everyday of last year in his expenses alone. None of us were aware that this had gotten so far out of hand.

Exhibit C, Plaintiffs' Supplemental Memorandum. As has already been discussed, Henry does not dispute the accuracy of the specific sum of money spent for personal expenses.

The second statement is underlined and reproduced below in the context of the lengthy paragraph in which it appears:

> We also don't intend to pay him for his sick leave balance. *Nor are we going to pay him the 25 cents a mile rate to ride his motorcycle, he awarded himself, on his 2,000 mile trip to OSH and his 3,000 mile trip to SEA last year.* We will pay him whatever the current government rate is at the time he accounts.

*Id.* As has already been discussed, Henry disputes neither that he made these trips nor that he sought reimbursement for the trips at a rate of 25 cents per mile.

---

**16.** Even if the statement could be characterized as either true or false, the statement appears in a specific and a social context that belies its allegedly defamatory nature. *See infra* sections II(E)(2)(b)(iii)–(iv).

**17.** On April 15, 1992, Henry wrote a letter to all NAATS members in which he presented his view of the facts surrounding his removal as Executive Director of NAATS.

Contrary to Henry's assertion, the proper inquiry for these statements is not whether they "suggest" that funds have been misappropriated. *See* Affidavit of Bruce B. Henry ¶ 13(b), Plaintiffs' Supplemental Memorandum. Under the second prong of the two-part *Potomac Valve* test, the Court must examine the language, specific context, and social context of the statements. · If *any* of these three factors would allow a reasonable reader to recognize their weakly substantiated or subjective character and discount them accordingly, then the underlined statements above are protected opinions. *See Potomac Valve,* 829 F.2d at 1288.

The Court concludes that Exhibit C does not qualify as protected opinion under the first *Ollman* factor, which focuses on the language of the statements. Under the language analysis in *Potomac Valve,* the question for this Court is whether the defamatory terms are precise in meaning and objective in tone or, on the contrary, whether they are loosely definable, variously interpretable, and exaggerated and hyperbolic in tone. *Id.* at 1287 n. 21 (citations omitted). The letter from the Board · to all NAATS members merely comments on the apparently true fact that Henry spent $33,724 in personal expenses and expresses the opinion that 25 cents per mile is too high a reimbursement rate. Both statements have reasonably precise meanings derived from explicit references to discrete facts (*i.e.,* specific monetary sums).

Similarly, the language of the four statements in Exhibit D, *see supra* note 8 and accompanying text, are precise in meaning and objective in tone. Either Henry billed NAATS for cross-country motorcycle trips, kept records of leave usage, removed a computer and video tapes, or he did not. The language is not loosely definable, variously interpretable, or exaggerated and hyperbolic in tone. The allegations are specific, factual,

and objective. Thus, the four statements in Exhibit D do not qualify as protected opinion under the first *Ollman* factor. If either of the remaining factors is satisfied, however, the statements in Exhibits C and D can still constitute protected opinion.

iii) *The Second* Ollman *Factor: Specific Context of the Statements* [18]

The specific context of the statements within the letters as a whole shows that Exhibits C and D are nothing more than responses to a previous letter from Henry to all NAATS members. Exhibit 17, Defendants' Motion to Dismiss. When read in this light, the allegedly defamatory statements represent only the opinion of the NAATS Board regarding various and disputed claims for reimbursement. As such, the colloquy between the NAATS Board and Henry is precisely the type of "competition of . . . ideas" envisioned by the *Gertz* Court. 418 U.S. at 340, 94 S.Ct. at 3007. Indeed, as both parties state in their missives, the very purpose of this "battle of letters" was to inform the NAATS membership about the removal of the Executive Director and the Executive Vice President so that each member could make an informed decision as to the propriety of the Board's action. Thus, because no reasonable reader would fail to recognize the inherently subjective character of the Board's letters, this Court finds that the statements in Exhibits C and D constitute protected opinion and are not actionable. The plaintiffs have failed to produce clear and convincing evidence to the contrary.

iv) *The Third* Ollman *Factor: Broader Social Context of the Statements* [19]

As the defendants have correctly noted, the Board's letters appear within the broader social context of labor management dis-

---

**18.** The analysis of specific context is the same for the allegations of corruption and for all other statements. Accordingly, the Court will conduct a single analysis of this *Ollman* factor covering all allegedly libelous statements.

**19.** Normally, the satisfaction of any one of the three *Ollman* factors would render the statements protected opinion. In the interest of com-

pleteness, however, the Court will proceed to analyze the final *Ollman* factor of social context.

The analysis of social context is the same for the allegations of corruption and for all other statements. Accordingly, the Court will conduct a single analysis of this *Ollman* factor covering all allegedly libelous statements.

putes.[20] As the Supreme Court observed in *Linn*, "[l]abor disputes are ordinarily heated affairs" often characterized by "bitter and extreme charges, countercharges, unfounded rumors, vituperations, personal accusations, misrepresentations and distortions." 383 U.S. at 58, 86 S.Ct. at 661. Further, "[b]oth labor and management often speak bluntly and recklessly, embellishing their respective positions with imprecatory language." *Id.* Finally, libel actions must be analyzed in the context of national labor policy. *Id.*

Almost ten years after *Linn*, the Supreme Court reaffirmed these principles in *Austin*. 418 U.S. at 283, 94 S.Ct. at 2780. "[F]ederal law gives a union license to use intemperate, abusive, or insulting language without fear of restraint or penalty if it believes such rhetoric to be an effective means to make its point." *Id.* Although *Linn* and *Austin* concerned libel in the context of a statute and an executive order, respectively, both cases recognize what Henry, the NAATS Board, and the 1700 NAATS members would have also recognized: that labor disputes occur within a broader social context of vigorous and vociferous—and often verbally abusive—debate. This Court must be wary of "dampen[ing] the ardor of labor debate." *Linn*, 383 U.S. at 64, 86 S.Ct. at 664.

Having concluded that the allegedly defamatory statements occur within a broader social context of labor disputes, this Court finds that the statements in Exhibits C and D are protected opinion and therefore not actionable. The plaintiffs have failed to present clear and convincing evidence to the contrary.

## III. *CONCLUSION*

For the reasons stated above, the defendants' Motion for Summary Judgment is GRANTED as to Counts I, II, III, IV, and V of the Amended Complaint.